**MCKAY LAW, LLC**
Michael C. McKay (023354)
5635 N. Scottsdale Road, Suite 170
Scottsdale, Arizona 85250
Telephone: (480) 681-7000
Email: mmckay@mckaylaw.us

*Counsel for Plaintiff*

[Additional Counsel on signature page]

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Samhita Gera, derivatively on behalf of Opendoor Technologies Inc. (f/k/a Social Capital Hedospohia Holdings Corp. II), | Case No.: |
| Plaintiff, | **Verified Shareholder Derivative Complaint** |
| vs. | |
| Chamath Palihapitiya, Steven Trieu, Ian Osborne, David Spillane, Adam Bain, Eric Wu, Carrie Wheeler, Cipora Herman, Pueo Keffer, Glen Solomon, Jason Kilar, Jonathan Jaffe, John Rice, and SCH Sponsor II LLC, | **Jury Trial Demanded** |
| Defendants, | |
| and | |
| Opendoor Technologies Inc. (f/k/a Social Capital Hedospohia Holdings Corp. II), | |
| Nominal Defendant. | |

Plaintiff Samhita Gera ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Opendoor Technologies Inc., f/k/a Social Capital Hedosophia Holdings Corp. II ("Opendoor" or the "Company"),[1] files this Verified Shareholder Derivative Complaint against Defendants Chamath Palihapitiya ("Palihapitiya"), Steven Trieu ("Trieu"), Ian Osborne ("Osborne"), David Spillane ("Spillane"), Adam Bain ("Bain"), Eric Wu ("Wu"), Carrie Wheeler ("Wheeler"), Cipora Herman ("Herman"), Pueo Keffer ("Keffer"), Glenn Solomon ("Solomon"), Jason Kilar ("Kilar"), Jonathan Jaffe ("Jaffe"), John Rice ("Rice") (together, the "Individual Defendants"), and SCH Sponsor II LLC (the "Sponsor") (collectively with Opendoor and the Individual Defendants, "Defendants") for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the Company, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.

---

[1] "Opendoor" refers to the Company after the December 2020 Merger (defined below) and name change, whereas "SCH" refers to the Company prior to the Merger and name change. "Legacy Opendoor" refers to Opendoor Labs Inc., the private company before the Merger.

Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Company's current and former directors and officers from November 30, 2020 through November 3, 2022, both dates inclusive (the "Relevant Period").

2.      Opendoor is a residential iBuyer real estate transaction company that purports to operate an e-commerce platform that leverages software, data science, product design, and operations with the aim of providing a streamlined, on-demand, and mobile process of buying and selling homes to its customers. iBuyers are companies that utilize automated valuation model ("AVM") algorithms to estimate home prices, buy homes directly from the home's seller, and then flip the home quickly for a profit, sometimes within twenty-four hours.[2] According to Opendoor, individuals looking to sell their homes can use the Company's mobile app or website and receive an immediate, "market-based" cash offer for their home. Once an offer is made, Opendoor identifies "necessary" repairs and subtracts the cost of the repairs from the cash offer. Opendoor claims that the repair evaluation process is used to "make sure the house is safe and

---

[2] The "i" stands for "instant." iBuyers include companies such as Zillow and Redfin. According to *The New York Times*, iBuyers "offer 0.22 percent less than fair-market value for a home and charge the seller slightly higher fees, about 1.3 percent more than a conventional listing agent would. The trade-off is a faster transaction — the process takes days rather than weeks, as there are no extended escrow periods — and fewer of the hurdles that give sellers headaches, like open houses and multiple showings with strangers." *See* "Is iBuying Here to Stay?" *The New York Times*, Nov. 19, 2021, https://www.nytimes.com/2021/11/19/realestate/ibuying-ilending.html

functional," not to "uncover every deficiency in your home to lower the offer." Opendoor further claims that home sellers even save money under the Company's repair program since "we do our best to pass wholesale savings on to you from our partnerships with local vendors." On top of repairs costs, Opendoor collects a 5% service charge fee for selling each home.

3.      Opendoor previously operated as a special purpose acquisition company ("SPAC"), a publicly traded corporation with a two-year life span formed with the sole purpose of effecting a merger, or "combination," with a privately held business to enable it to go public. The Company is the result of a business combination that closed on December 21, 2020 (the "Merger") with Opendoor Labs Inc. ("Legacy Opendoor"), a private company founded in 2014 by Defendant Wu that purportedly sought to "reinvent one of life's most important transactions with a new, radically simple way to buy and sell a home." Prior to the Merger, the Company was named Social Capital Hedosophia Holdings Corp. II ("SCH"). Unbeknownst to the shareholders who approved the Merger, (i.e., SCH's shareholders), the value of the Merger was not in line with Defendants' representations. In fact, through the Merger, SCH inherited a business that was a far cry from revolutionizing the residential real estate market and offered little in the way of financial growth or success. By making false and misleading statements regarding the capabilities of Legacy Opendoor's pricing algorithm and SCH's due diligence of Legacy Opendoor prior to the Merger, Defendants successfully deceived the investing public into approving the Merger, and with it, lucrative arrangements that materially benefitted insiders at SCH and Legacy Opendoor to the Company's detriment. The full truth

remained hidden from investors until years after the Merger closed and the value of the Company's securities tanked to new lows.

4.     SCH was incorporated in the Cayman Islands on October 18, 2019. SCH's most significant investor was the Sponsor, which was managed and controlled by Defendants Palihapitiya and Osborne. Several of the Individual Defendants were direct or indirect members of the Sponsor.

5.     Initially, as noted in its draft registration statement filed with the SEC on January 20, 2020, SCH's stated business targets were companies in the technology industries. Indeed, SCH's directors and officers held themselves out to investors as highly experienced in the technology and finance industries, which they repeatedly stated would be SCH's focus for completing a merger.

6.     Prior to SCH's initial public offering ("IPO"), the Sponsor purchased an aggregate of 8,625,000 shares of common stock from SCH for an aggregate purchase price of $25,000 in cash, or approximately $0.003 per share (the "Founder Shares"). In March 2020, the Sponsor transferred 100,000 of the Founder Shares to each of Defendant Spillane and Defendant Herman, who served as two of SCH's independent directors.

7.     On April 27, 2020, SCH effected a pro rata share capitalization which increased the number of outstanding Founder Shares from 8,625,000 to 10,350,000, thereby ensuring that the Sponsor would retain approximately 20% of the total issued and outstanding shares of SCH upon the consummation of SCH's IPO. Through the issuance of the Founder Shares, the Sponsor, and by their joint control of the Sponsor, Defendants Palihapitiya and Osborne, collectively owned approximately 20% of SCH's issued and

outstanding shares of common stock as of the date of the Merger Proxy Statement (defined below). The Merger Proxy Statement reported that each of Defendants Palihapitiya and Osborne may be deemed the beneficial owner of the Founder Shares held by the Sponsor.

8.      On April 30, 2020, SCH closed its IPO, selling 41,400,000 units at $10.00 per unit and generating gross proceeds of $414,000,000. In addition, SCH issued units to the Sponsor in a private placement that occurred simultaneously with the closing of the IPO. Specifically, the Sponsor purchased an aggregate of 6,133,333 private placement warrants at a price of $1.50 per private placement warrant, for a purchase price of $9,200,000 (the "Private Placement Warrants").

9.      Following the closing of SCH's IPO, $414,000,000 of the net proceeds generated from the IPO and simultaneous private placement were placed in a trust account (the "Trust"), and these funds were to be released only upon the closing of a qualifying business combination, or in the case of liquidation to return the funds to SCH's investors. The Trust was established to safeguard two key rights held by SCH shareholders under SCH's Amended and Restated Memorandum and Certificate of Association (the "Certificate of Incorporation"): (1) the right to redeem their shares at $10.00 per share price instead of investing in the business combination; and (2) in the event SCH was unable to timely complete the business combination, the right to receive a return of all IPO proceeds.

10.      However, as certain of the Individual Defendants had either a direct or indirect economic interest in the Founder Shares and Private Placement Warrants, their

financial interests were misaligned with those of SCH shareholders. These conflicts of interest only worsened once SCH determined it would complete a business combination with Legacy Opendoor. Pursuant to SCH's Certificate of Incorporation, SCH had only 24 months from the date of the IPO's closing, or until April 30, 2022, to complete a business combination. This meant that, in the event SCH failed to complete a business combination by that time, SCH would have had to: (1) cease all its operations, except those made for the purposes of winding up the Company's affairs and liquidating; (2) redeem public shares; and (3) dissolve and liquidate the funds held in the Trust to return to SCH's investors. Because each of SCH's officers and directors agreed to waive their rights to liquidating distributions from the Trust, the $414 million in Founder Shares and Private Placement Warrants would have been rendered worthless to them in the event SCH failed to timely complete a business combination.

11.     Driven by their strong motivations to avoid liquidation of the Trust and cash out on their investments, the Individual Defendants affiliated with SCH were highly motivated to facilitate a business combination with just about any company. Despite repeatedly representing to investors prior to and after its IPO that it planned to merge with a healthy, qualified company specializing in the technology industry, by mid-May 2020, Defendant Bain had begun engaging Defendant Wu for purposes of effectuating a Merger with Legacy Opendoor, a company plagued by issues arising from, among other things, a faulty housing market pricing algorithm.

12.     Between the end of May 2020 and August 7, 2020, SCH and its advisors repeatedly represented to investors that they had conducted substantial due diligence of

Legacy Opendoor in anticipation of the proposed merger. In reality, SCH's due diligence of Legacy Opendoor was glaringly inadequate, as it unreasonably failed to: (1) investigate and confirm Legacy Opendoor's claims about having a "highly responsive" real estate artificial intelligence-powered algorithm; or (2) investigate the consumer fraud concerns surrounding Legacy Opendoor's questionable repair invoices.

13.    This information was highly material to investors. The Company's plan to provide best-in-the-industry residential real estate value forecasts hinges on its purported proprietary technology—an artificial intelligence ("AI") powered algorithm—which Legacy Opendoor claimed was "highly responsive" and was impervious to changing macroeconomic housing market conditions. Indeed, during the Relevant Period, Defendant Wheeler emphasized how important pricing is to Opendoor's business, noting that "pricing is absolutely core to what we do. It is something that Opendoor[] has been investing in religiously from day one as a core capability in eight years of investment and that's not going to abate." Unbeknownst to the investing public, however, Legacy Opendoor's AI algorithm was not autonomous, but instead required human input and was therefore susceptible to human miscalculation of the housing market, just as any other iBuyer competitor such as Zillow was. In addition to the lackluster AI-powered algorithm, Legacy Opendoor was also plagued by a series of consumer fraud concerns involving its business practices, particularly Legacy Opendoor's practice of overcharging customers via artificially inflated repair invoices. Indeed, the Federal Trade Commission ("FTC") began investigating Legacy Opendoor in 2019, and soon thereafter determined that Legacy Opendoor "frequently demanded cosmetic changes such as repainting and

replacement of items that could be repaired at far lower cost" and "[i]f the repairs cost less than the amount deducted, Opendoor retains the excess as profit." These concerns were significant to the investing public, as the Company's AI-powered algorithm and, relatedly, basic business model were essential to performing its operations.

14.    On September 15, 2020, SCH issued a press release announcing that it had entered into an Agreement and Plan of Merger with Legacy Opendoor and Hestia Merger Sub Inc. ("Merger Sub") (the "Merger Agreement"). Pursuant to the terms of the Merger Agreement, upon consummation of the Merger, Merger Sub would merge with and into Legacy Opendoor, the separate corporate existence of Merger Sub would cease, and Legacy Opendoor would become the surviving corporation and a wholly owned subsidiary of SCH. SCH would then immediately be renamed Opendoor Technologies Inc.

15.    On November 30, 2020, SCH filed a proxy statement with the SEC (the "Merger Proxy Statement"). The Merger Proxy Statement was solicited by the Board of Directors of SCH, including Defendants Bain, Herman, Palihapitiya, Osborne, and Spillane, who purportedly approved the Merger Agreement "after careful consideration" and recommended that SCH shareholders approve the Merger, the 2020 Incentive Award Plan (the "Incentive Plan"), and the election of seven directors (including Defendants Wu, Bain, Herman, Keffer, Solomon, Kilar, and Jaffe) to the post-Merger Company's Board. The Merger Proxy Statement represented to investors that the aggregate value of the consideration to be paid by SCH in the Merger was approximately $5 billion through the issuance of approximately 560,005,000 shares of "New Opendoor" common stock

issued by SCH, calculated as follows: (i) 500,000,000 shares of Opendoor common stock priced at $10.00 per share to existing Legacy Opendoor shareholders; (ii) 3,980,000 shares to Defendants Wu and Wheeler as consideration for their public equity ("PIPE") financing ("Opendoor PIPE Investors"); (iii) 41,400,000 shares of Opendoor common stock priced at $10.00 per share to SCH's shareholders; (iv) 26,375,000 shares of Opendoor common stock priced at $10.00 per share to the Sponsor; and (v) 40,000,000 shares of Opendoor common stock priced at $10.00 per share to the third party PIPE investors. As a result, Legacy Opendoor shareholders received significant shares in the post-Merger Company from the Company that were more valuable than what Legacy Opendoor was worth, thereby damaging the Company.[3]

16.    The Merger Proxy Statement included a series of false and misleading statements which touted the value represented by the Merger and Legacy Opendoor. In particular, the Merger Proxy Statement contained materially false and misleading statements and omissions that failed to disclose, *inter alia*: (i) the Company misrepresented to its pre-Merger investors the nature and capabilities of Legacy Opendoor's AI-powered algorithm to accurately estimate home prices; and (ii) Legacy Opendoor utilized a practice of overcharging customers via artificially inflated repair invoices, and therefore continuously overstated the effectiveness of its strategies and capability to grow and maintain a profitable contribution margin, a key metric in the real

---

[3] Shareholders that did not redeem at $10 per share before the Merger closed became holders of Opendoor common stock and were damaged thereby.

estate industry.[4] As a result of the material misrepresentations and omissions made by the Individual Defendants in the Merger Proxy Statement and statements leading up to the close of the Merger, shareholders were unaware of material undisclosed risks and were deceived into approving the unfavorable Merger for which the Company overpaid for Legacy Opendoor instead of redeeming their initial investments, which were valued greater than any interest they later obtained in the Company, given the true value of Legacy Opendoor (collectively, the "Overpayment Misconduct").

17.    On December 17, 2020, the Merger closed. By the close of trading on December 21, 2020, the first day the Company's shares began trading on NASDAQ, the Company's share price was $31.25 per share. The matters misrepresented in the Merger Proxy Statement directly impacted the Company's ability to successfully operate and its capability of achieving consistent and robust contribution margins, both of which are integral to the Company's actual worth, and in result, the post-Merger Company's stock. Indeed, the Merger Proxy Statement represented to SCH shareholders that Legacy Opendoor was a serious housing market disrupter that was impervious to market fluctuations because it possessed a sophisticated and highly adaptive automated pricing

---

[4] Opendoor describes the importance of contribution margin in the Company's 2020 Form 10-K, stating that contribution margin is "an important measure of business performance as it captures the unit level performance isolated to homes sold in a given period and provides comparability across reporting periods. Contribution Profit helps management assess inflows and outflows directly associated with a specific resale cohort." The 2020 Form 10-K also stated that Opendoor's "long-term financial performance depends, in part, on continuing to expand unit margins through" initiatives such as "[p]ricing engine optimization and enhancements" and "[l]owering platform costs through refinement, greater automation and self-service . . . ."

algorithm that outpaced competitors and positioned the Company to consistently increase its contribution margin, a key metric in the real estate industry that signals success in accurately pricing and selling homes for profit. Throughout the Relevant Period, the Individual Defendants emphasized to investors that "[t]he ultimate measure you should hold us accountable for is how we're doing on contribution margin delivery" and that "forecasting accuracy [is] what allows [Opendoor] to . . . deliver margins within that 4% to 6% contribution margin range that we've guided to." The Merger Proxy Statement discussed Legacy Opendoor's contribution margins at levels between 1.9% to 3.5% and made representations indicating to investors that, based on Legacy Opendoor's purported industry-disrupting pricing algorithm, this contribution margin percentage would inevitably rise, thereby benefitting the post-Merger Company and its investors. Little did investors know that, during the Relevant Period, Opendoor's contribution margin would fall into the negatives.

18.    As a result of Defendants' materially false and misleading statements, investors wholeheartedly believed that Opendoor's AI-powered algorithm set the Company apart from its competitors, including Zillow, who had the second highest revenue among iBuyers in 2021. Indeed, on August 2, 2021, InvestorPlace reported that "[o]ne of the main reasons for Opendoor's success is its robust pricing algorithm" and further noted that "[Opendoor's] competitors — Zillow [] and Offerpad — do not possess such pricing engines." Moreover, based on Defendants' positive representations, just ten days later, on August 12, 2021, Wedbush added Opendoor to the "Wedbush Best Ideas List" and stated in an analyst report that "***Opendoor's pricing capabilities have been best***

*in class*, and we believe its vast data is a significant asset." (Emphasis added.)

19.     On November 2, 2021, Zillow revealed that it would cease its iBuying business due to Zillow's algorithm's inability to accurately predict home prices. That day, Zillow's CEO issued a public statement revealing that "fundamentally, *[Zillow] ha[s] been unable to predict future pricing of homes to a level of accuracy that makes this a safe business to be in*." (Emphasis added.) The market quickly reacted to Zillow's abrupt withdrawal from the iBuying industry, soon thereafter questioning the capability of AI-created algorithms in general to accurately predict housing market pricing trends. As a result of this widespread skepticism, Opendoor's stock price fell more than 14.5% on November 2, 2021, from a closing price of $24.75 per share on November 1, 2021 to close at a price of $21.12 per share on November 2, 2021.

20.     A little over a week later, on November 10, 2021, the Company released an earnings report announcing its financial results for the third quarter of 2021. That same day, Opendoor held an earnings call with investors and analysts to discuss the Company's financial performance for the quarter. During the call, Defendant Wheeler represented to investors that, in contrast to Zillow's, Opendoor's algorithm was "highly responsive" to macroeconomic conditions in the housing market. She also told investors that "[i]mportant is that *our model really works in upmarkets, it's going to work in flat markets, it's going to work in downmarkets*." (Emphasis added.)

21.     As a result of these rosy representations, Opendoor's stock jumped back to life, rising more than 15.5% the following day, from a closing price of $19.52 per share on November 10, 2021 to close at a price of $22.56 per share on November 11, 2021.

22.    As the Company's stock traded at artificially inflated prices, just five days later, beginning on November 16, 2021, Defendant Wu went on a dayslong personal selling spree of his Opendoor stock holdings. Indeed, on November 16, 2021, he sold 1,613,498 of his shares of Company common stock, receiving over $35 million in proceeds. The following day, November 17, 2021, Defendant Wu sold another 628,348 shares of Company common stock, receiving more than $13 million in proceeds. Similarly, on November 18, 2021, Defendant Wu sold another 443,182 shares of Company common stock, enjoying additional proceeds of more than $9 million. Taken together, in just three days, Defendant Wu sold *more than 2.6 million shares of Opendoor stock for personal proceeds of over $57.6 million.* In total, during the Relevant Period, Defendant Wu made *over $112 million in proceeds* as a result of selling Company common stock while its price was artificially inflated due to Defendants' misrepresentations.

23.    The truth about Opendoor began to emerge on February 24, 2022 when the Company announced that its contribution margin for the fourth quarter of 2021 was just 4%, constituting a significant drop from the 12.6% contribution margin Legacy Opendoor had attained in the fourth quarter of 2020.

24.    On this news, the Company's share price dropped $2.54 (or 23%) from a closing price of $10.98 per share on February 24, 2022 to close at a price of $8.44 per share on February 25, 2022.

25.    Around this time during the first quarter of 2022, interest rates rose and home prices fell nationwide. As a result, investors and analysts became even more

skeptical of the Company's operations, continuing to question Opendoor's purported ability to successfully weather the poor macroeconomic conditions in "any" housing market. Still, Defendants continued to mislead investors about Opendoor's pricing algorithm and the Company's ability to thrive even during a crippling lull in the housing market, with Defendant Wu telling investors during a March 8, 2022 investor conference that the Company's business model and contribution margin could flourish in all market conditions, even during the "worst recession in U.S. history." Defendant Wu made these statements despite knowing that: (1) Opendoor's algorithm was not impervious to fluctuations in the housing market; (2) Opendoor relied on human analysis rather than AI forecasting to price homes on its platform; and (3) Opendoor engaged in fraudulent consumer practices.

26.    Indeed, Plaintiffs' counsel in the Securities Class Action (defined below) interviewed six former employees of Opendoor (the "CWs"), who confirmed that, by mid-2022, Opendoor was suffering from abnormally high home inventory due to the Company's algorithm's inability to accurately digest, understand, and predict changes in the overall housing market. As a result, the CWs revealed, Opendoor began to extend credits and other incentives to sellers and pay outside real estate brokers large commissions to aid in the selling of the Company's overflowing home inventory, all of which practices ate into Opendoor's profits. However, Defendants concealed this reality from investors.

27.    Several months later, on August 1, 2022, the FTC issued a press release announcing that it had reached a $62 million settlement with Opendoor pertaining to

claims that the Company engaged in deceptive trade practices. In addition to paying out the hefty settlement sum, Opendoor was required to modify its business practices. Moreover, as part of the settlement, the FTC publicly released its complaint against Opendoor (the "FTC Complaint"). The FTC stated in an accompanying blog post that Opendoor claimed the Company's "cutting-edge technology would save sellers money by providing 'market value' offers and reducing transaction costs." However, through its investigation, the FTC found that "***the vast majority of consumers who sold to Opendoor lost thousands compared to what they would have realized in net proceeds from selling on the market*** because Opendoor's offers have been below market value on average and its costs have been significantly higher than what consumers typically pay." (Emphasis added.) Further, the FTC determined that Opendoor employees frequently adjusted home values manually—contrary to the repeated representations made by Defendants throughout the Relevant Period of AI-based pricing adjustments—and engaged in other fraudulent conduct. In particular, the FTC revealed that the Company would often charge consumers for a general list of unnecessary home repairs, such as installing a new air conditioner or painting the rooms of a house, that Opendoor required to be completed before a house could be sold. If the consumer trying to sell their house to Opendoor did not inquire or object to this general list of repairs, Opendoor would often not complete some or all of the repairs and simply pocket the extra money, with the FTC noting that "Opendoor has sent customers a list of required repairs with the cost it would charge consumers if they agree to deduct the costs from their sales proceeds. ***The list of repairs has been typically well beyond what consumers would be responsible for in a market***

*sale*." (Emphasis added.) The FTC further determined that many of the repairs were not necessary, stating that "Opendoor has routinely requested upgrades to, or replacement of, functional heating and cooling systems, flooring, and roofs. It has also frequently demanded cosmetic changes such as repainting and replacement of items that could be repaired at far lower cost." In addition, the FTC found that Opendoor would take up to 18 days after the Company initially made an offer on a house to provide the seller with a list of repairs. This meant that the sellers could not timely walk away from deals with Opendoor since, by that point, they had already placed deposits on the new homes. Notably, the FTC discovered that Opendoor's ***own internal communications*** called this practice a "***bait-and-switch operation***." (Emphasis added.)

28.    Nevertheless, even after the FTC's findings came to light, Defendants continued to mislead investors regarding the capabilities of Opendoor's pricing algorithm and business model and the Company's overall health and prospects. Indeed, on August 4, 2022, Defendant Wheeler again represented to investors that Opendoor's algorithm functions well in the uncertain housing market, stating that "our systems are doing exactly what they're designed to do, which is responding very, very quickly, adjusting prices to market . . ."

29.    The truth about the Company continued to emerge on September 19, 2022 when Bloomberg reported that Opendoor lost money on 42 percent of its transactions in August 2022 (as measured by the prices at which it bought and sold properties). These significant losses unquestionably indicated that Opendoor's algorithm could not accurately predict pricing trends in the housing market.

30.    On this news, the Company's share price dropped $0.32, from a closing price of $3.88 per share on September 19, 2022 to close at a price of $3.56 per share on September 20, 2022. The Company's share price continued to fall the next trading day, dropping another $0.31, from a closing price of $3.56 per share on September 20, 2022 to close at a price of $3.25 per share on September 21, 2022.

31.    On November 3, 2022, the truth fully emerged when Opendoor revealed that the Company's contribution margin had slid into the negatives for the third quarter of 2022, bottoming out at -0.7%, significantly below Opendoor's purported forecast of 4% to 6% contribution margin, and even further below Opendoor's reported 7.5% contribution margin from the third quarter of 2021. These poor contribution margin results further revealed that Opendoor's pricing algorithm significantly struggled to interpret a changing housing market and corroborated Bloomberg's September 19, 2022 report that Opendoor was suffering from significant losses as a result of overpaying for properties.

32.    On this news, the Company's share price dropped $0.32, from a closing price of $2.34 per share on November 3, 2022 to close at a price of $2.02 per share on November 4, 2022. The Company's share price continued to fall the next trading day, dropping $0.29, from a closing price of $2.02 per share on November 4, 2022 to close at a price of $1.73 per share on November 7, 2022.

33.    Less than a month later, effective on December 1, 2022, Defendant Wu resigned as CEO of Opendoor, shifting to a new position as the Company's President of Marketplace. Defendant Wheeler vacated her post of CFO that same day to become

Opendoor's next CEO.

34.     During the Relevant Period, the Individual Defendants made and/or caused the Company to make to the investing public a series of materially false and misleading statements regarding the business, operations, and prospects of the Company and Legacy Opendoor. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) Legacy Opendoor did not have a fully automated AI-powered algorithm; (2) as a result, Legacy Opendoor relied on human judgment to assess pricing trends and was, therefore, not as reliable or as high-quality of an operation as Defendants represented; (3) due to the foregoing, the post-Merger Company was susceptible to changing market conditions just like its main competitor, Zillow; (4) the Company engaged in the Overpayment Misconduct; (5) Legacy Opendoor (and following the Merger, the Company) engaged in fraudulent business practices including issuing fake repairs to bolster profits; (6) Opendoor's contribution margins were susceptible to falling into the negatives; (7) in light of the foregoing, Opendoor's financial projections were impossible to attain and patently unrealistic; and (8) Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the Incentive Plan. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

35.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

36.     The conflicts of interest that precipitated the Overpayment Misconduct,

include, but are not limited to, the staggering personal financial gains received by the Individual Defendants as a result of the Merger closing. For instance, Defendant Wu's compensation rose over 1300x as a result the Merger, rising from total compensation amounts of $275,000 in 2019 from Legacy Opendoor, to total compensation amounts of more than $370 million in 2022 from Opendoor. Likewise, Defendant Wheeler received more than $50.2 million in 2020. Additionally, Defendant Bain, Defendant Herman, Defendant Jaffe, Defendant Keffer, Defendant Kilar, and Defendant Solomon each received lucrative compensation of $282,896, $636,877, $263,726, $274,421, $274,421, and $280,077, respectively, after the closing of the Merger. The latter amounts pale in comparison to the windfall Defendants Palihapitiya, Trieu, Osborne, and Spillane (collectively, the "SCH Defendants") received from the Merger through their interests in the Founder Shares. Indeed, the Sponsor purchased the Founder Shares for just $25,000 approximately one year before the Merger, and the Founder Shares after the Merger had a market value in excess of $100 million. During the Relevant Period, these Founder Shares reached a staggering valuation of $403 million when Opendoor's common stock was trading at a price of $39 per share. Critically, if the Merger did not close, the SCH Defendants would have missed out on the substantial windfalls to be received from the Founder Shares and Private Placement Warrants, which would have expired worthless had SCH failed to timely complete a qualifying business combination. Likewise, all of the Defendants who served on Opendoor's Board after the Merger, including Defendants Wu, Wheeler, Bain, Herman, Jaffe, Keffer, Kilar, and Solomon, received large grants of Opendoor restricted stock in the weeks following the Merger. Similarly, the Defendants

who served on the SCH board at the time and held Founder Shares collectively received millions of dollars in profits from the closing of the Merger.

37.    Additionally, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls.

38.    In light of the Individual Defendants' misconduct—which has negatively impacted the value of the Company, caused the Company to be subjected to the Overpayment Misconduct and to pay unjust compensation to Defendants, subjected the Company to costly investigations and settlements, including a $62 million settlement with the FTC, and subjected the Company to a consolidated federal securities class action lawsuit currently pending in the United States District Court for the District of Arizona (the "Securities Class Action"), which names Legacy Opendoor's co-founder and former CEO, Opendoor's former CFO and current CEO, a majority of Opendoor's current Board of Directors, and SCH's former board of directors as defendants—the Company has expended hundreds of millions of dollars and will have to expend millions more.

39.    In light of the Company's directors' receipt of material benefits due to the approval of the Merger and the Incentive Plan, collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of the Individual Defendants' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

**JURISDICTION AND VENUE**

40.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)) and Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9).

41.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

42.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

43.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District, and Opendoor is headquartered in this District.

**PARTIES**

**Plaintiff**

44.     Plaintiff is a current shareholder of Opendoor common stock. Plaintiff has continuously held Opendoor common stock since purchasing it on June 18, 2020.

**Nominal Defendant Opendoor**

45.     Nominal Defendant Opendoor is a Delaware corporation with principal executive offices located at 410 N. Scottsdale Road, Suite 1600, Tempe, AZ 85281.

46.     The Company's shares trade on NASDAQ under the ticker symbol "OPEN."

**The Sponsor**

47.　　The Sponsor, SCH Sponsor II LLC, a Cayman Islands limited liability company, served as the sponsor of SCH leading up to the Merger and is affiliated with several of the Individual Defendants. The Sponsor and its affiliates collectively owned over 19% of the Company's common stock and were conflicted in the Merger given their investments in SCH would have been rendered worthless had SCH failed to timely complete a qualifying business combination.

48.　　Defendants Palihapitiya and Osborne were the two managing members of the Sponsor at all relevant times.

**Defendant Wu**

49.　　Defendant Wu founded Legacy Opendoor in 2014. He served as Legacy Opendoor's CEO from its founding until the Merger and as the Company's CEO and Chairman of the Board from the Merger until December 1, 2022. Since December 2022, he has served as the Company's President of Marketplace and as a Company director. According to the Company's Schedule 14A filed with the SEC on April 27, 2023 (the "2023 Proxy Statement"), as of March 27, 2023, Defendant Wu beneficially owned 30,403,853 shares of the Company's common stock, representing 4.70% of the Company's outstanding shares. Given that the price per share of the Company's common stock at the close of trading on March 27, 2023 was $1.60, Defendant Wu owned approximately $48.6 million worth of Opendoor stock.

50.　　For the fiscal year ended December 31, 2020 ("2020 Fiscal Year"), Defendant Wu received $370,240,992 in compensation from the Company. This included

$189,584 in salary and $370,051,408 in stock awards. For the fiscal year ended December 31, 2021 ("2021 Fiscal Year"), Defendant Wu received $112,333,540 in compensation from the Company. This included $325,100 in salary, $111,598,143 in stock awards, and $410,297 in all other compensation. For the fiscal year ended December 31, 2022 ("2022 Fiscal Year"), Defendant Wu received $325,000 in compensation from the Company, consisting entirely of salary.

51.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Wu made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| May 20, 2021 | 625,687 | $14.93 | $9,341,506 |
| July 16, 2021 | 186,265 | $14.60 | $2,718,537 |
| August 5, 2021 | 34,129 | $14.51 | $495,348 |
| August 16, 2021 | 45,210 | $15.27 | $690,311 |
| October 14, 2021 | 622,616 | $23.75 | $14,788,997 |
| October 15, 2021 | 598,868 | $23.61 | $14,137,476 |
| October 18, 2021 | 173,142 | $24.08 | $4,169,259 |
| November 16, 2021 | 1,613,498 | $21.79 | $35,151,667 |
| November 17, 2021 | 702,429 | $21.41 | $15,041,112 |
| November 18, 2021 | 443,182 | $20.66 | $9,157,912 |
| January 19, 2022 | 178,219 | $10.16 | $1,811,417 |
| February 16, 2022 | 63,164 | $11.01 | $695,498 |
| April 18, 2022 | 180,760 | $8.26 | $1,493,258 |
| May 17, 2022 | 70,632 | $7.22 | $509,680 |
| July 18, 2022 | 166,311 | $5.26 | $875,294 |

| August 17, 2022 | 82,288 | $5.26 | $432,834 |
| October 10, 2022 | 100,000 | $2.78 | $277,900 |
| October 11, 2022 | 7,724 | $3.00 | $23,172 |
| October 18, 2022 | 170,320 | $2.60 | $443,002 |

Thus, in total, before the fraud was exposed, he sold 6,064,444 shares of Company stock on inside information, for which he received approximately $112 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

52.    The 2023 Proxy Statement stated the following about Defendant Wu:

Eric Wu co-founded Opendoor and has served as President, Marketplace since December 2022 and as a member of our board of directors since April 2014. He previously served as our Chief Executive Officer from January 2014 to December 2022 and as Chairman of our board of directors from December 2020 to December 2022. Prior to Opendoor, Mr. Wu founded and, from 2009 to 2011, served as the Chief Executive Officer of Movity.com, a geo-data analytics company, until its acquisition by Trulia.com in 2011, after which he served as Head of Geo/Social Products until 2013. Mr. Wu also previously co-founded RentAdvisor.com, an apartment search company specializing in lead generation, in 2008, which was later acquired by Apartment List, Inc. in 2010. Mr. Wu received his B.S. degree in Economics from the University of Arizona.

Skills and Qualifications: We believe that Mr. Wu is qualified to serve as a member of our Board due to the perspective and experience he brings as our co-founder and President, Marketplace, and also as our former Chief Executive Officer and his extensive experience founding and managing real estate and technology companies.

**Defendant Palihapitiya**

53.     Defendant Palihapitiya served as SCH's CEO and Chairman of the Board from October 2019 until the Merger. Moreover, he and Defendant Osborne share control over the Sponsor.

54.     The Merger Proxy Statement stated the following about Defendant Palihapitiya:

> Mr. Chamath Palihapitiya has been SCH's Chief Executive Officer and the Chairman of SCH's board of directors since October 2019. Mr. Palihapitiya served as the Chief Executive Officer and the Chairman of the Board of Directors of IPOA from May 2017 until the consummation of its business combination with Virgin Galactic in October 2019, and continues to serve as the Chairman of the Board of Directors of Virgin Galactic. Mr. Palihapitiya also served as a director of Slack Technologies Inc. from April 2014 until October 2019. Prior to founding Social Capital in 2011, Mr. Palihapitiya served as Vice President of User Growth at Facebook, and is recognized as having been a major force in its launch and growth. Mr. Palihapitiya was responsible for overseeing Monetization Products and Facebook Platform, both of which were key factors driving the increase in Facebook's user base to more than 750 million individuals worldwide. Prior to working for Facebook, Mr. Palihapitiya was a principal at the Mayfield Fund, one of the United States' oldest venture firms, before which he headed the instant messaging division at AOL. Mr. Palihapitiya graduated from the University of Waterloo, Canada with a degree in electrical engineering.

**Defendant Trieu**

55.     Defendant Trieu served as SCH's CFO from January 2020 until the Merger.

56.     The Merger Proxy Statement stated the following about Defendant Trieu:

> Mr. Steven Trieu has been the Chief Financial Officer of SCH since January 2020. Mr. Trieu is a Partner and the Chief Financial Officer of Social Capital, an affiliate of the Company's sponsor, since October 2017 and is responsible for overseeing the operations of Social Capital's family of funds, management company and related entities. Mr. Trieu served as the Chief Financial Officer of IPOA from March 2019 until the

consummation of its business combination with Virgin Galactic in October 2019. Prior to joining Social Capital, Mr. Trieu was VP of Finance at Quora, Inc. from October 2011 to June 2016, where he was responsible for its day-to-day finance and legal operations. Prior to that, Mr. Trieu was Director, Finance and Business Operations at Facebook, Inc. from August 2007 to October 2011. Mr. Trieu led the formation of its initial business operations and sales finance teams. Mr. Trieu also previously held a similar role at Yahoo!, Inc., supporting its local markets and commerce divisions. Before that, Mr. Trieu spent time on Wall Street both as an investment banking and alternative investments associate. Mr. Trieu graduated from the University of Massachusetts, Amherst with a degree in finance and economics.

**Defendant Osborne**

57.     Defendant Osborne served as SCH's President and as a Company director from October 2019 until the Merger. Defendant Osborne also controlled and managed the Sponsor, together with Defendant Palihapitiya, at all relevant times.

58.     The Merger Proxy Statement stated the following about Defendant Osborne:

Mr. Ian Osborne has been a director of SCH since October 2019 and the President since January 2020. Mr. Osborne is the Co-founder and Chief Executive Officer of Hedosophia, an investment firm, which has invested in leading Internet and technology companies since 2012. Mr. Osborne served as a director of IPOA from May 2017 until the consummation of its business combination with Virgin Galactic in October 2019. Mr. Osborne has advised leading Internet and technology companies, their founders and CEOs, since 2009. Mr. Osborne is also the indirect controlling shareholder and a director of Connaught, a financial advisory firm. From 2010 to 2012, Mr. Osborne was a Partner and Managing Director at DST Global, a family of funds investing in Internet companies, which was established in 2009 and which has notable successes including Alibaba, Airbnb, Facebook, Spotify and Twitter. Mr. Osborne was educated at St Paul's School, King's College London, and the London School of Economics.

**Defendant Spillane**

59.     Defendant Spillane served as a Company director from October 2019 until

1    the Merger.

2        60.    The Merger Proxy Statement stated the following about Defendant Spillane:

3
4    Mr. David Spillane has been a director of SCH since April 2020.
     Mr. Spillane is a California licensed Certified Public Accountant and a
5    Fellow of the Institute of Chartered Accountants in Ireland. He works as
     an advisor to high net worth individuals, and is involved in investing and
6    advising seed stage companies. Mr. Spillane previously served as the
     Chief Accountant at Stripe, Inc., a private high growth financial payments
7    company operating globally. Prior to that, Mr. Spillane was the Chief
     Accounting Officer at Facebook from 2009 to 2013, responsible for
8    global accounting and control operations and helping Facebook through
     its initial public offering in 2012. From 1997 to 2009, Mr. Spillane spent
9    12 years at EY in Dublin, Ireland, San Jose, California and San Francisco,
10   California where he served in the audit practice at all levels up to senior
     manager. Mr. Spillane holds a Bachelor of Commerce degree from
11   University College Dublin and a Master's degree in Accounting from the
12   Smurfit School of Business at University College Dublin.

13
14   **Defendant Wheeler**

15       61.    Defendant Wheeler has served as the Company's CEO and as a member of
16
     the Board since December 2022. She previously served as the Company's CFO from the
17
18   Merger until December 2022. According to the 2023 Proxy Statement, as of March 27,
19   2023, Defendant Wheeler beneficially owned 2,720,486 shares of the Company's
20
     common stock. Given that the price per share of the Company's common stock at the close
21
22   of trading on March 27, 2023 was $1.60, Defendant Wheeler owned approximately $4.4
23   million worth of Opendoor stock.

24       62.    For the 2020 Fiscal Year, Defendant Wheeler received $50,275,445 in
25
     compensation from the Company. This included $114,722 in salary and $50,060,723 in
26
27   stock awards. For the 2021 Fiscal Year, Defendant Wheeler received $350,000 in
28   compensation from the Company, consisting entirely of salary. For the 2022 Fiscal Year,

Defendant Wheeler received $383,334 in compensation from the Company, consisting entirely of salary.

63.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Wheeler made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| June 18, 2021 | 8,576 | $16.70 | $143,202 |
| June 23, 2021 | 119,175 | $17.10 | $2,037,892 |
| March 16, 2022 | 79,912 | $7.41 | $591,748 |
| June 16, 2022 | 121,742 | $4.53 | $548,919 |
| September 16, 2022 | 115,378 | $4.07 | $469,011 |

Thus, in total, before the fraud was exposed, she sold 444,783 shares of Company stock on inside information, for which she received approximately $3.8 million in proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

64.    The 2023 Proxy Statement stated the following about Defendant Wheeler:

Carrie Wheeler has served as our Chief Executive Officer and as a member of our Board since December 2022. She previously served as our Chief Financial Officer from September 2020 to December 2022. Ms. Wheeler also previously served as a member of our Board from October 2019 to September 2020. From 1996 to 2017, Ms. Wheeler was with TPG Global, a global private equity firm, including as a Partner and Head of Consumer / Retail Investing. Ms. Wheeler currently serves on the board of directors and on the audit and compensation committees of APi Group Corporation, a global provider of safety and specialty services, since November 2019. She previously served on the board and audit committee of Dollar Tree, inc. from March 2019 to March 2022. Ms. Wheeler has also served on a number of

other corporate boards of private and public companies, including Neiman Marcus Group (2005 to 2013) and Petco Animal Supplies (2016 to 2015). Ms. Wheeler received her Bachelor of Commerce degree from Queen's University in Canada.

Skills and Qualifications: We believe that Ms. Wheeler is qualified to serve as a member of our Board because of her extensive experience in a leadership role at a global private equity firm, as well as her experience with our company as our Chief Executive Officer and former Chief Financial Officer, and her wealth of experience across different industries.

**Defendant Bain**

65.    Defendant Bain has served as a Company director since the Merger. He also serves as a member of the Audit Committee and the Compensation Committee. Previously, he served as an SCH director from October 2019 until the Merger. According to the 2023 Proxy Statement, as of March 27, 2023, Defendant Bain beneficially owned 2,853,016 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 27, 2023 was $1.60, Defendant Bain owned approximately $4.6 million worth of Opendoor stock.

66.    From the Merger through the 2021 Fiscal Year, Defendant Bain received $282,896 in compensation from the Company, consisting entirely of stock awards. For the 2022 Fiscal Year, Defendant Bain received $233,399 in compensation from the Company. This included $67,500 in fees earned or paid in cash and $165,899 in stock awards.

67.    The 2023 Proxy Statement stated the following about Defendant Bain:

Adam Bain has served as a member of our board of directors since December 2020, prior to which he served as a member of SCH's board of directors. Mr. Bain is a co-founder and co-Managing Partner of 01 Advisors, a venture capital firm targeting high-growth technology companies, since January 2018. Mr. Bain has served as a member of the board of directors of Virgin Galactic Holdings Inc., a publicly traded spaceflight company, where

he serves as the chair of the nominating and corporate governance committee and as a member of the compensation committee since the consummation of its business combination with Social Capital Hedosophia Holdings Corp. (IPOA), which was a publicly traded special purpose acquisition company ("SPAC"), in October 2019. Prior to that, he served as a member of the board of directors of IPOA from September 2017 to October 2019. Since November 2016, Mr. Bain has also been an independent advisor and investor in select privately held growth-stage companies. Previously, from 2015 to November 2016, Mr. Bain served as the Chief Operating Officer of Twitter, Inc., a publicly traded social media company, and also served as President of Global Revenue & Partnerships from 2010 to 2015. Mr. Bain received his B.A. degree in English Journalism from Miami University in Ohio.

Skills and Qualifications: We believe Mr. Bain is qualified to serve as a member of our board of directors because of his significant operating and technology experience and financial experience.

**Defendant Herman**

68.     Defendant Herman has served as a Company director since the Merger. She also serves as the Chair of the Audit Committee. Previously, she served as an SCH director from October 2019 until the Merger. According to the 2023 Proxy Statement, as of March 27, 2023, Defendant Herman beneficially owned 168,818 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 27, 2023 was $1.60, Defendant Herman owned approximately $270,109 worth of Opendoor stock.

69.     From the Merger through the 2021 Fiscal Year, Defendant Herman received $636,877 in compensation from the Company, consisting entirely of stock awards. For the 2022 Fiscal Year, Defendant Herman received $235,970 in compensation from the Company. This included $70,000 in fees earned or paid in cash and $165,970 in stock awards.

70.     The 2023 Proxy Statement stated the following about Defendant Herman:

Cipora Herman has served as a member of our Board since December 2020 and previously served as a member of the board of directors of SCH from May 2020 until the closing of our Business Combination with SCH in December 2020. Ms. Herman has served on the board of directors of ZipRecruiter, Inc., a publicly traded online employment marketplace company, since October 2018, where she also serves as the chair of the audit committee and a member of the compensation committee. Previously, Ms. Herman served as the Chief Financial Officer for LA28, The Los Angeles Organizing Committee for the Olympic and Paralympic Games 2028, from January 2021 to April 2022. Ms. Herman also served on the board of directors of MINDBODY, Inc., a software-as-a-service company, from October 2016 to February 2019. From 2012 to 2016, Ms. Herman served as the Chief Financial Officer of the San Francisco 49ers, a professional American football team. Prior to that, Ms. Herman has served in various leadership roles in large online media and technology companies, including as Vice President & Treasurer of Facebook, Inc., from 2007 to 2012, and in various roles at Yahoo! Inc. from 2003 to 2007, including VP Finance and Treasurer. She also served on private company board of directors, including Memery, Inc. (dba Overlay) from 2015 to January 2021. Ms. Herman received her A.B. degree in International Relations, M.A. degree in International Development Policy and M.B.A degree, each from Stanford University.

Skills and Qualifications: We believe that Ms. Herman is qualified to serve as a member of our board of directors because of her financial expertise and experience as a director of publicly and privately held companies.

**Defendant Jaffe**

71.     Defendant Jaffe has served as a Company director since the Merger. Previously, he served as a Legacy Opendoor director from June 2018 until the Merger. He also serves as a member of the Nominating and Corporate Governance Committee. According to the 2023 Proxy Statement, as of March 27, 2023, Defendant Jaffe beneficially owned 50,097 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 27, 2023 was

$1.60, Defendant Jaffe owned approximately $80,155 worth of Opendoor stock.

72.    From the Merger through the 2021 Fiscal Year, Defendant Jaffe received $263,726 in compensation from the Company. This included $57,104 in fees earned or paid in cash and $206,622 in stock awards. For the 2022 Fiscal Year, Defendant Jaffe received $218,986 in compensation from the Company. This included $55,000 in fees earned or paid in cash and $163,986 in stock awards.

73.    The 2023 Proxy Statement stated the following about Defendant Jaffe:

Jonathan Jaffe has served as a member of our Board since June 2018. Mr. Jaffe has served as Co-Chief Executive Officer and Co-President of Lennar Corporation, one of the nation's largest homebuilders, since November 2020, and as a member of the board of directors since 2018 (and also served as a director from 1997 to 2004). Prior to that, he served in various senior management roles, including, President from April 2018 to November 2020, Chief Operating Officer from December 2004 to January 2019, Vice President from 1994 to April 2018, and a Regional President in Lennar's Homebuilding operations prior to that. Mr. Jaffe served as a member of the board of directors of Five Point Holdings, LLC from 2009 to 2020 and currently serves on the board of one privately held company. Mr. Jaffe received his B.A. degree in Architecture from the University of Florida.

Skills and Qualifications: We believe that Mr. Jaffe is qualified to serve as a member of our board of directors because of his extensive knowledge of the housing industry and his deep operating experience.

**Defendant Keffer**

74.    Defendant Keffer has served as a Company director since the Merger. Previously, he served as a Legacy Opendoor director from October 2015 until the Merger. He also serves as a member of the Audit Committee. According to the 2023 Proxy Statement, as of March 27, 2023, Defendant Keffer beneficially owned 441,414 shares of the Company's common stock. Given that the price per share of the Company's common

33

stock at the close of trading on March 27, 2023 was $1.60, Defendant Keffer owned approximately $706,262 worth of Opendoor stock.

75.    From the Merger through the 2021 Fiscal Year, Defendant Keffer received $274,421 in compensation from the Company, consisting entirely of stock awards. For the 2022 Fiscal Year, Defendant Keffer received $225,695 in compensation from the Company. This included $60,000 in fees earned or paid in cash and $165,695 in stock awards.

76.    The 2023 Proxy Statement stated the following about Defendant Keffer:

Pueo Keffer has served as a member of our board of directors since October 2015. Mr. Keffer has served as a Managing Director of Access Technology Ventures, the venture capital and growth technology investment arm of Access Industries, Inc. since 2015. From 2009 to 2015, Mr. Keffer served in various roles at Redpoint Ventures, most recently as a Partner. Since 2015, he has served on the board of directors of DigitalOcean Holdings, Inc., a publicly traded cloud computing platform company. He also serves on the board of directors of two privately held companies. Previously, Mr. Keffer was an associate at TA Associates, a growth private equity firm, and a financial analyst at Goldman Sachs & Co. Mr. Keffer received his B.A. degree in Economics from Stanford University.

Skills and Qualifications: We believe that Mr. Keffer is qualified to serve as a member of our board of directors because of his extensive experience advising technology companies as a venture capital investor and director of various companies and his financial experience.

**Defendant Kilar**

77.    Defendant Kilar has served as a Company director since the Merger. Previously, he served as a Legacy Opendoor director from March 2019 until the Merger. He also serves as the Chair of the Nominating and Corporate Governance Committee. According to the 2023 Proxy Statement, as of March 27, 2023, Defendant Kilar

34

beneficially owned 196,779 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 27, 2023 was $1.60, Defendant Kilar owned approximately $314,846 worth of Opendoor stock.

78.     From the Merger through the 2021 Fiscal Year, Defendant Kilar received $274,421 in compensation from the Company, consisting entirely of stock awards. For the 2022 Fiscal Year, Defendant Kilar received $225,695 in compensation from the Company. This included $60,000 in fees earned or paid in cash and $165,695 in stock awards.

79.     The 2023 Proxy Statement stated the following about Defendant Kilar:

Jason Kilar has served as a member on our Board since March 2019. Previously, Mr. Kilar served as the Chief Executive Officer of Warner Media, LLC, a media and entertainment subsidiary of its public company parent, Warner Bros. Discovery, Inc. from May 2020 to April 2022. Prior to that, Mr. Kilar co-founded and served as the Chief Executive Officer of Vessel Group, Inc., a video platform company, from 2013 to 2017. Prior to Vessel, Mr. Kilar co-founded and served as the Chief Executive Officer of Hulu, LLC, a streaming service company, from 2007 to 2013. Mr. Kilar also served in a variety of senior leadership roles with Amazon.com, Inc., an e-commerce technology company, from 2002 to 2006, including as Senior Vice President, Worldwide Application Software, and Vice President and General Manager of Amazon's North American media businesses. He has also served on various other private company boards of directors, including Univision Communications Inc. from September 2016 to April 2020 and Brighter Inc. from 2013 until its acquisition by Cigna Corporation in 2017. Mr. Kilar received his B.A. degree in Journalism and Business Administration from University of North Carolina at Chapel Hill and M.B.A. degree from Harvard Business School.

Skills and Qualifications: We believe that Mr. Kilar is qualified to serve as a member of our Board because of his deep expertise in operations as a Chief Executive Officer and seasoned board member, and his extensive experience with technology, high-growth, consumer and digital companies.

**Defendant Solomon**

80.     Defendant Solomon has served as a Company director since the Merger.

Previously, he served as a Legacy Opendoor director from February 2015 until the Merger. He also serves as the Chair of the Compensation Committee. According to the 2023 Proxy Statement, as of March 27, 2023, Defendant Solomon beneficially owned 13,209,328 shares of the Company's common stock, or 2.04% of the total outstanding stock of the Company. Given that the price per share of the Company's common stock at the close of trading on March 27, 2023 was $1.60, Defendant Solomon owned approximately $21,134,925 worth of Opendoor stock.

81.    From the Merger through the 2021 Fiscal Year, Defendant Solomon received $280,077 in compensation from the Company, consisting entirely of stock awards. For the 2022 Fiscal Year, Defendant Solomon received $230,827 in compensation from the Company. This included $65,000 in fees earned or paid in cash and $165,827 in stock awards.

82.    The 2023 Proxy Statement stated the following about Defendant Solomon:

Glenn Solomon has served as a member of our board of directors since February 2015. Mr. Solomon has been a Managing Partner of GGV Capital, a venture capital firm, since 2006, and as a director of Hashicorp, Inc., a publicly traded software company, since September 2014, where he also serves as chair of the compensation committee and as a member of the audit committee. He also serves as a director of a number of privately held companies and previously served as a director of Domo, Inc., a cloud software company from August 2017 to March 2019. Mr. Solomon received his B.A. degree in Public Policy from Stanford University and M.B.A. from Stanford University.

Skills and Qualifications: We believe that Mr. Solomon is qualified to serve as a member of our board of directors because of his extensive experience advising technology companies as a venture capital investor and director of various companies.

**Defendant Rice**

83.    Defendant Rice has served as a Company director and as the Board's Lead Independent Director since March 2021. Previously, he served as a Legacy Opendoor director until the Merger. He also serves as a member of the Nominating and Corporate Governance Committee. According to the 2023 Proxy Statement, as of March 27, 2023, Defendant Rice beneficially owned 69,036 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 27, 2023 was $1.60, Defendant Rice owned approximately $110,458 worth of Opendoor stock.

84.    From the Merger through the 2021 Fiscal Year, Defendant Rice received $627,711 in compensation from the Company. This included $43,510 in fees earned or paid in cash and $584,201 in stock awards. For the 2022 Fiscal Year, Defendant Rice received $220,552 in compensation from the Company. This included $55,000 in fees earned or paid in cash and $165,552 in stock awards.

85.    The 2023 Proxy Statement stated the following about Defendant Rice:

John Rice has served as a member of our board of directors since March 2021. Mr. Rice is the founder and Chief Executive Officer of Management Leadership for Tomorrow ("MLT"), a national non-profit organization founded in 2001 that fights racial and economic disparities by empowering a new generation of diverse leaders. Prior to MLT, Mr. Rice was an executive with the National Basketball Association ("NBA") from 1996 to 2000, where he served in various roles, including as Managing Director of NBA Japan and as Director of Marketing for Latin America. Prior to that, Mr. Rice spent four years with the Walt Disney Company in new business development and marketing and two years with AT&T. Since 2010, Mr. Rice has served as a member of the board of directors of Walker & Dunlop, Inc. a publicly traded real estate finance company, where he also serves as chair of the nominating and corporate governance committee and

as a member of the compensation committee. He also serves on the board of directors of Morgan Stanley Real Estate's Prime Property Fund, a privately held diversified real estate fund. Mr. Rice is also a member of the Yale University board of trustees. Mr. Rice received his B.A. degree from Yale University and M.B.A. degree from Harvard Business School.

Skills and Qualifications: We believe that Mr. Rice is qualified to serve as a member of our board of directors because of his executive leadership skills, strategic planning experience, public company experience and extensive expertise in driving talent development and fostering diversity and inclusion efforts across organizations.

## THE COMPANY'S CODE OF CONDUCT, AUDIT COMMITTEE CHARTER, AND CORPORATE GOVERNANCE

### SCH's Code of Ethics

86.    SCH's Code of Ethics and Business Conduct ("Code of Ethics") begins by stating it is "applicable to all of the Company's directors, officers and employees" and was adopted to:

- promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;
- promote the full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission (the "*SEC*"), as well as in other public communications made by or on behalf of the Company;
- promote compliance with applicable governmental laws, rules and regulations;
- deter wrongdoing; and
- require prompt internal reporting of breaches of, and accountability for adherence to, this Code.

87.    The Code of Ethics states that "[e]ach person owes a duty to the Company to act with integrity. Integrity requires, among other things, being honest, fair and candid. Deceit, dishonesty and subordination of principle are inconsistent with integrity." It also

provides that "[s]ervice to the Company should never be subordinated to personal gain and advantage."

88.    In a section titled "Honest, Ethical and Fair Conduct," the Code of Ethics provides that "each person must":

- Act with integrity, including being honest and candid while still maintaining the confidentiality of the Company's information where required or when in the Company's interests;

- Observe all applicable governmental laws, rules, and regulations;

- Comply with the requirements of applicable accounting and auditing standards, as well as Company policies, in order to maintain a high standard of accuracy and completeness in the Company's financial records and other business-related information and data;

- Adhere to a high standard of business ethics and not seek competitive advantage through unlawful or unethical business practices;

- Refrain from taking advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice;

- Protect the assets of the Company and ensure their proper use;

89.    The Code of Ethics, under "Disclosure," provides that SCH "strives to ensure that the contents of and the disclosures in the reports and documents that the Company files with the SEC and other public communications shall be full, fair, accurate, timely and understandable in accordance with applicable disclosure standards, including standards of materiality, where appropriate."

90.    The Code of Ethics, under "Compliance," provides that it is SCH's "obligation and policy to comply with all applicable governmental laws, rules and

39

regulations. All directors, officers and employees of the Company are expected to understand, respect and comply with all of the laws, regulations, policies and procedures that apply to them in their positions with the Company. Employees are responsible for talking to their supervisors to determine which laws, regulations and Company policies apply to their position and what training is necessary to understand and comply with them."

### *Opendoor Code of Conduct*

91.    The Opendoor Code of Conduct (the "Code of Conduct") states that the Company is "committed to upholding the highest standards of business conduct and ethics across our family of companies" and that the Code "reflects our values and commitment to fostering behaviors that live up to our ethical standards."

92.    The Code of Conduct also states the Company expects "every employee, officer and director to read and understand the Code and its application to the performance of their business responsibilities, and to develop a sense of commitment to the spirit of the Code, not just the words."

93.    The Code of Conduct further states in the section titled, "We Live Our Values" that it "is the policy of Opendoor to promote high standards of integrity by conducting our affairs in an honest and ethical manner. The integrity and reputation of our company depends on the honesty, fairness and integrity brought to the job by each person associated with Opendoor. Unyielding personal integrity is the foundation of corporate integrity."

94.    In another section titled "We Avoid Conflicts of Interest," the Code of Conduct states the following, in relevant part:

> We respect the rights of our team members to manage their personal affairs and investments and do not wish to impinge on their personal lives. That said, team members should be careful to ensure that their personal interests do not interfere in any way with the performance of their duties or the best interests of Opendoor. A conflicting personal interest could result from an expectation of personal gain now or in the future or from a need to satisfy a prior or concurrent personal obligation. Avoiding potential conflicts of interest also means that you should not use, or allow others to use, Opendoor products, services, internal tools, or information in a way that improperly benefits you or someone you know or creates the appearance that you or they have received an advantage over others. We expect our employees to be free from influences that conflict with the best interests of Opendoor. Even the appearance of a conflict of interest where none actually exists can be damaging and should be avoided. Conflicts of interest are prohibited unless specifically authorized.

95.    In another section titled, "We Are Loyal," the Code of Conduct states that "[y]ou may not take personal advantage of opportunities for Opendoor that are presented to you or discovered by you as a result of your position with us or through your use of corporate property or information. Even opportunities that are acquired privately by you may be questionable if they are related to our existing or proposed lines of business. You may not use your position with us or corporate property or information for improper personal gain, nor should you compete with us in any way."

96.    Under a section titled, "We Maintain Financial Integrity," the Code of Conduct states the following, in relevant part:

> The integrity of our records and public disclosure depends upon the accuracy and completeness of the information supporting the entries to our books of account. We rely on our team members to ensure that our corporate and business records are completed accurately and honestly. The making of false or misleading entries, whether they relate to financial results or other

operational results, is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, creditors, team members and others with whom we do business. It is of the utmost importance that our books, records and accounts accurately and fairly reflect, in reasonable detail, our assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities.

97.     In the same section, the Code of Conduct provides the following regarding SEC filings and public financial statements:

We also rely on our accounting records to produce reports for our management, directors, stockholders and creditors, as well as for governmental agencies. In particular, we rely upon our accounting and other business and corporate records in preparing the periodic and current reports that we file with the Securities and Exchange Commission (the "SEC"). Securities laws require that these reports provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations. Team members who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosure is accurate and transparent and that our reports contain all of the information about Opendoor that would be important to enable stockholders and potential investors to assess the soundness and risks of our business and finances and the quality and integrity of our accounting and disclosures.

98.     Under a section titled, "We Conduct Business Fairly," the Code of Conduct states that "we are committed to doing business with fairness, integrity and honesty. We maintain our advantages over competitors through the superior performance of our products and services, not through unethical or illegal business practices."

99.     Under a section titled "We Safeguard And Protect Our Company Assets," the Code of Conduct states the following, in relevant part:

All team members are expected to protect our assets and ensure their efficient use. Theft, carelessness and waste have a direct impact on our profitability. Our physical property, such as office supplies, computer equipment, and buildings, as well as our services, internal tools and data are

expected to be used only for legitimate business purposes, although incidental personal use may be permitted. You may not, however, use our corporate name, any brand name or trademark owned or associated with Opendoor or any letterhead stationery for any personal purpose. All data residing on or transmitted through our computing and communications systems, including email and documents, is the property of Opendoor and subject to inspection, retention and review by Opendoor, with or without a team member's or third party's knowledge, consent or approval, in accordance with applicable law. Any misuse or suspected misuse of our assets must be immediately reported to your manager or the Compliance Officer.

100.    In a section titled "We Comply With Laws," the Code of Conduct provides the following:

Obeying the law, both in letter and in spirit, is the foundation of the Code. Our success depends upon each team member operating within legal guidelines and cooperating with local, national and international authorities. We expect team members to understand the legal and regulatory requirements applicable to their business units and areas of responsibility. While we do not expect you to memorize every detail of these laws, rules and regulations, we want you to be able to determine when to seek advice from others. If you have a question in the area of legal compliance, it is important that you not hesitate to seek answers from your manager or the Legal Team. Disregard of the law will not be tolerated. Violation of domestic or foreign laws, rules and regulations may subject an individual, as well as Opendoor, to civil and/or criminal penalties. You should be aware that conduct and records, including emails, are subject to internal and external audits and to discovery by third parties in the event of a government investigation or civil litigation. It is in everyone's best interests to know and comply with our legal obligations.

101.    Under a subsection titled, "Insider Trading," the Code of Conduct states the following:

Employees who have access to material, non-public information ("inside information") about Opendoor or about other companies with which Opendoor has business dealings are not permitted to use or share that information for stock trading purposes or for any other purpose except to conduct our business. Use of inside information by someone for personal gain, or to pass on, or "tip," the inside information to someone who uses it

for personal gain, is illegal, regardless of the quantity of shares, and is therefore prohibited. You can be held liable both for your own transactions and for transactions effected by a person who receives the tip, even if indirectly through another person. Team members must exercise the utmost care when handling inside information. Please review Opendoor's Insider Trading and Trading Window Policy for additional information.

102.    In the same section, the Code of Conduct provides that "[i]t is the responsibility of all employees, officers and directors to comply with all applicable laws, regulations, governmental policies, the Code and the Company's related policies and procedures. It is the responsibility of all Company supervisory personnel to monitor compliance with this Code. The Board of Directors will periodically review for compliance with the Company's policies and procedures."

***Audit Committee Charter***

103.    The Charter of the Audit Committee of the Board of Directors of Opendoor Technologies, Inc. (the "Audit Committee Charter") defines the responsibilities of the Company's Audit Committee.

104.    Per the Audit Committee Charter, the Audit Committee's purpose is to "oversee the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company."

105.    The Audit Committee Charter lists the Audit Committee's responsibilities, some of which are to review the following:

- the adequacy and effectiveness of the Company's accounting and internal control policies and procedures on a regular basis, including the responsibilities, budget, compensation and staffing of the Company's internal audit function, if any, through inquiry and discussions with the Company's independent auditors, management and the Company's corporate controller or chief accounting officer, if any;

- if applicable, the yearly report prepared by management, and attested to by the Company's independent auditors, assessing the effectiveness of the Company's internal control over financial reporting and stating management's responsibility for establishing and maintaining adequate internal control over financial reporting prior to its inclusion in the Company's Annual Report on Form 10-K.

- all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information.

- any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting.

- the Company's administrative, operational and accounting internal controls, including any special audit steps adopted in light of the discovery of material control deficiencies.

- Review and discuss with management and the independent auditors the Company's audited financial statements, including the matters required to be discussed by applicable Public Company Accounting Oversight Board standards and SEC rules.

106. In violation of the SCH Code of Ethics, the Code of Conduct, and the Audit Committee Charter, the Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' and the Sponsor's engagement in or effectuation of the Overpayment Misconduct and violations of Section 14(a) of the Exchange Act. Also in violation of SCH's and Opendoor's corporate governance documents, the Defendants failed to maintain the accuracy of SCH and Opendoor reports and other documents filed with the SEC, comply with laws and regulations, conduct business in an honest and ethical manner, ensure the efficient and responsible use of SCH's and Opendoor's assets and resources by SCH and Opendoor, and oversee the

integrity of financial information provided by SCH and Opendoor to their shareholders, the public, and any stock exchange.

107.   The Individual Defendants who were at the Company before and after the Merger conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including violations of Section 14(a) of the Exchange Act. Also in violation of the Company's corporate governance documents, the Individual Defendants who were at the Company before and after the Merger failed to maintain the accuracy of Company records and reports, comply with laws and regulations, oversee the integrity of the Company's financial statements, and maintain internal controls.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

#### *Background of SCH*

108.   SCH was incorporated in the Cayman Islands on October 18, 2019, as a special purpose acquisition company (i.e., a SPAC) formed for the purpose of effecting a merger, capital stock exchange, or similar business combination with one or more businesses. It was managed by the Sponsor, SCH Sponsor II LLC, which was jointly controlled by Defendants Palihapitiya and Osborne.

109.   SCH was one of many SPACs founded by former Facebook executive Defendant Palihapitiya, along with his long-time business partners and venture capitalists Defendant Bain and British technology investor Defendant Osborne. After accumulating

wealth from working in Silicon Valley, Defendant Palihapitiya founded Social Capital, a venture capital firm, in 2011. Since then, Defendant Palihapitiya has relentlessly pushed SPAC mergers on private companies such as Richard Branson's Virgin Galactic and healthcare technology firm Clover Health Investments.[5] Indeed, Defendant Palihapitiya is notorious for pushing SPACs; he has been dubbed the "SPAC king" and the "evangelist and the apostle of SPACs."[6]

110.    Defendant Palihapitiya served as the CEO and Chairman of the Board of SCH, while Defendant Osborne served as the President and as a director of SCH. Together, Defendants Palihapitiya and Osborne have incorporated numerous SPACs, including Social Capital Hedosophia Holdings Corp. III ("IPOC"), Social Capital Hedosophia Holdings Corp. IV ("IPOD"), Social Capital Hedosophia Holdings Corp. V ("IPOE"), and Social Capital Hedosophia Holdings Corp. VI ("IPOF"). To this end, Defendant Osborne has served as the President of IPOC, IPOD, IPOE and IPOF. Both

---

[5] Defendant Palihapitiya, targeting everyday investors through appearances on CNBC and via his busy X account (formerly known as Twitter), drove, at least initially, Virgin Galactic's and Clover Health's publicly traded stock to staggering prices after the SPACs he founded and controlled merged with those companies. However, following their respective mergers, both companies' common stock quickly nosedived in value, but not before Defendant Palihapitiya sold his massive interests in the companies for hefty personal profits. Defendant Bain, Defendant Trieu, and Defendant Osborne were involved in the Virgin Galactic and Clover Health mergers; Bain personally received over $10 million for his role in the Virgin Galactic merger while Osborne and Palihapitiya received a whopping $864 million worth of Virgin Galactic stock because of the merger. Unfortunately, the story remains the same in this case.

[6] Maureen Farrell, The 'SPAC King' Is Over It," The New York Times, Dec. 7, 2022, https://www.nytimes.com/2022/12/07/business/chamath-palihapitiya-spac-investors.html.

1

IPOD and IPOF were shuttered in September 2022 after failing to find merger targets.[7]

2

      111.    SCH was incorporated in the Cayman Islands on October 18, 2019. SCH's

3

4

most significant investor was the Sponsor, managed and controlled by Defendants

5

Palihapitiya and Osborne. Several of the Individual Defendants were direct or indirect

6

members of the Sponsor.

7

      112.    Initially, as noted in its draft registration statement filed with the SEC on

8

9

January 20, 2020, SCH's stated business targets were companies in the technology

10

industries. Indeed, SCH's directors and officers held themselves out to investors as highly

11

experienced in the technology and finance industries, which they repeatedly stated would

12

be SCH's focus for completing a merger.

13

14

      113.    Prior to SCH's IPO, the Sponsor purchased an aggregate of 8,625,000

15

Founder Shares for an aggregate purchase price of $25,000 in cash, or approximately

16

$0.003 per share. In March 2020, the Sponsor transferred 100,000 of the Founder Shares

17

to each of Defendant Spillane and Defendant Herman, who served as two of SCH's

18

19

independent directors.

20

      114.    On April 27, 2020, SCH effected a pro rata share capitalization that

21

22

increased the number of outstanding Founder Shares from 8,625,000 to 10,350,000,

23

thereby ensuring that the Sponsor would retain 20% of the total issued and outstanding

24

shares of SCH upon the consummation of SCH's IPO. Through the issuance of the

25

26

27

---

[7] Dan Primack, "Chamath Palihapitiya is shuttering two tech SPACs," Axios, Sept. 20, 2022, https://www.axios.com/2022/09/20/chamath-palihapitiya-spacs.

28

Founder Shares, the Sponsor, and by their joint control of the Sponsor, Defendants Palihapitiya and Osborne, collectively owned approximately 20% of SCH's issued and outstanding shares of common stock as of the date of the Merger Proxy Statement. The Merger Proxy Statement reported that each of Defendants Palihapitiya and Osborne may be deemed as beneficial owners of the Founder Shares held by the Sponsor.

115.    Just three days later, SCH held its IPO on April 30, 2020, selling 41.4 million common shares to the investing public for $10.00 per share, raising $414 million in proceeds. The common stock shares had redemption and liquidation rights. Specifically, if SCH failed to complete a business combination within 24 months of incorporation, SCH would liquidate, and public shareholders would receive $10.00 per share back with interest. If SCH found a target company, public shareholders had the option to redeem their shares for $10.00 per share plus interest.

116.    During the IPO, the Sponsor bought 6,133,333 Private Placement Warrants for $1.50 per unit for a total purchase price of $9,200,000. The Private Placement Warrants were composed of a warrant that entitled the holder to purchase a share of SCH Class A common stock. After the Merger, the warrant holder was entitled to purchase one common share of Opendoor common stock. The Private Placement Warrants were subject to a lock-up provision. However, in contrast to the public IPO shares, the Private Placement Warrants did not enjoy liquidation or redemption rights.

117.    The $414 million in proceeds from the IPO was put into the Trust, which required that the shares be redeemed in the first instance, contributed to a merger, or returned to shareholders in the event of liquidation. In other words, the Trust was

49

established to safeguard two key rights held by SCH shareholders under SCH's Certificate of Incorporation: (1) the right to redeem their shares at $10.00 per share price instead of investing in the business combination; and (2) in the event SCH was unable to timely complete the business combination, the right to receive a return of all IPO proceeds.

118.    However, as certain of the Individual Defendants had either a direct or indirect economic interest in the Founder Shares and Private Placement Warrants, their financial interests were misaligned with those of SCH shareholders. These conflicts of interest only worsened once SCH determined it would complete a business combination with Legacy Opendoor. Pursuant to SCH's Certificate of Incorporation, SCH had only 24 months from the date of the IPO's closing, or until April 30, 2022, to complete a business combination. This meant that, in the event SCH failed to complete a business combination by that time, SCH would have had to: (1) cease all its operations, except those made for the purposes of winding up the Company's affairs and liquidating; (2) redeem public shares; and (3) dissolve and liquidate the funds held in the Trust to return to SCH's investors. Because each of SCH's officers and directors agreed to waive their rights to liquidating distributions from the Trust, the $414 million Founder Shares and Private Placement Warrants would have been rendered worthless to them in the event SCH failed to timely complete a business combination.

119.    Throughout the Relevant Period, the Individual Defendants associated with SCH represented themselves to the investing public as having substantial experience in

identifying targets and acquiring businesses. In particular, the Individual Defendants touted their experience with investments and SPAC IPOs.

### Background of Legacy Opendoor

120.    In 2014, Defendant Wu and nonparty Ian Wong co-founded Legacy Opendoor, then called "Opendoor Labs Inc." to "redefine real estate." To achieve this goal, Legacy Opendoor attempted to design an AI algorithm that could process, identify, and predict trends in the housing market so that Legacy Opendoor could quickly and efficiently cash-buy and re-sell homes for a profit.

121.    Legacy Opendoor's proprietary AI algorithm was integral to its business, serving as the company's own stated-reason why Legacy Opendoor was superior to its iBuying competitors, such as Zillow. Indeed, Legacy Opendoor maintained that, contrary to the traditional residential real estate industry, which largely relied on human judgments and limited access to data, Legacy Opendoor "built world-class data science capabilities and systematized tooling to gather, aggregate and synthesize an expanding catalog of proprietary, hyperlocal data in order to improve and automate pricing decisions." Importantly, Legacy Opendoor maintained that because of its powerful algorithm, Legacy Opendoor was positioned to consistently increase its contribution margin in the future, which is a key metric in the real estate industry that signals success in accurately pricing and selling homes for profit.[8] The Merger Proxy Statement discussed Legacy Opendoor's

---

[8] Per Investopedia, contribution margin indicates how a particular product contributes to the overall profit of a company. Essentially, contribution margin is the selling price per product minus the variable cost per product. https://www.investopedia.com/terms/c/contributionmargin.asp.

contribution margins at levels between 1.9% to 3.5%, with the clear expectation that the percentage would rise. Little did investors know that during the Relevant Period, Opendoor's contribution margin would fall into the negatives.

122.    Legacy Opendoor, in the Merger Proxy Statement and in investor presentations leading up to the Merger, emphasized that one of Legacy Opendoor's main goals of merging with SCH was to capture more of the U.S. housing market by expanding its market presence fivefold.[9] Indeed, Defendant Wu stated on CNBC that "Originally, a SPAC deal wasn't the route we wanted to take…a couple things drew us to this path. One was speed to market."[10]

**_The Individual Defendants Needed the Merger to Close to Obtain Lucrative Compensation_**

123.    On May 13, 2020, during a phone call between Defendant Bain and a member of SCH's board of directors, the SCH director mentioned that Defendant Wu might be interested in learning about SPACs and potentially pursuing a SPAC to effectuate a merger with Legacy Opendoor. The SCH director floated the idea knowing that Defendant Bain and Defendant Wu have been acquainted for several years as a result of their work in the tech industry. Indeed, Defendant Bain served as the Chief Operating Officer of X (formerly known as Twitter) while Defendant Wu was working at Facebook.

---

[9] E.B. Solomont, "This man wants to make your home a commodity," The Real Deal: Real Estate News, Oct. 19, 2020, https://therealdeal.com/magazine/national-october-2020/this-man-wants-to-make-your-home-a-commodity/.
[10] _Id._

124.    Throughout June 2020, Defendants Bain and Wu discussed, through several phone calls and emails, a potential SPAC merger between one of Defendant Bain's SPACs and Legacy Opendoor. On June 29, 2020, Defendant Bain introduced Defendant Wu to Defendant Palihapitiya and Defendant Osborne via a video teleconference. During the conference, the group, including representatives from Legacy Opendoor, discussed a possible SPAC merger with Legacy Opendoor.

125.    Originally, Defendant Palihapitiya, Defendant Osborne, and Defendant Bain wanted Legacy Opendoor to merge with another of their SPACs ("SPAC A") which had a larger amount of money in its fund than SCH. However, between July 27, 2020 and July 28, 2020, Legacy Opendoor requested that SPAC A be eliminated from discussions and that SCH be inserted into discussions. According to the Merger Proxy Statement, Legacy Opendoor "representatives were concerned that merging with SPAC A would overly dilute Legacy Opendoor shareholders." Defendants Palihapitiya and Osborne agreed and told Defendant Bain of their decision on July 28, 2020.

**The Overpayment Misconduct**

126.    The next day, on July 29, 2020, Defendant Bain told representatives of SCH that Defendant Wu felt that Legacy Opendoor should be valued at $5 billion and that Legacy Opendoor would not agree to more than $300 in public equity ("PIPE") financing.

127.    On July 30, 2020, SCH executed a mutual non-disclosure agreement ("NDA") with Legacy Opendoor. After the NDA was signed, Legacy Opendoor began furnishing confidential information concerning Legacy Opendoor's business operations to SCH.

128.    On August 2, 2020, Defendant Wu emailed Defendant Bain informing Defendant Bain that Legacy Opendoor's board of directors, which included Defendants Jaffe, Keffer, Solomon, and Wheeler, would review and revise a non-binding letter of intent regarding the potential Merger.

129.    Two days later, Defendant Bain emailed Defendant Wheeler, who then served on Legacy Opendoor's board of directors, to communicate changes that would be made to the non-binding letter of intent regarding the potential Merger. One of the changes increased the PIPE investment from $400 to $600 million. Defendant Bain and Defendant Wheeler also discussed on a telephone call that day the increase in PIPE investment financing and specific entries on Legacy Opendoor's balance sheet, including "excess cash."

130.    The Sponsor-based PIPE investors eventually agreed to fund $160,250,000 of the total PIPE financing. Defendant Palihapitiya subscribed for 10,000,000 shares of Opendoor stock through his entity ChaChaCha SPAC B, LLC; Defendant Osborne subscribed for 5,800,000 shares of Opendoor stock through his entity Hedosophia Group Limited; Defendant Bain subscribed for 225,000 shares of Opendoor stock through his entity 010118 Management, L.P.; Defendant Wu subscribed for 25,000 shares of Opendoor stock; and Defendant Wheeler subscribed for 150,000 shares of Opendoor stock.

131.    On August 7, 2020, Defendant Bain and Defendant Palihapitiya, along with the rest of the SCH board of directors (Defendants Spillane, Osborne, and Herman), discussed the terms of the Merger via email. The emails included a copy of an investor

presentation prepared by Legacy Opendoor management pertaining to the valuation and business background of Legacy Opendoor. Defendant Palihapitiya also solicited questions from the SCH board of directors (Defendants Bain, Spillane, Osborne, and Herman). That same day, Defendant Osborne, on behalf of SCH, and Defendant Wu, on behalf of Legacy Opendoor, executed a final version of the non-binding letter of intent ("LOI"). The LOI provided, among other things, for a $5 billion valuation, that the PIPE investment would be $400 million, that at least $100 million of the $400 million would be from Sponsor-identified entities, and that at least $100 million of the $400 million would be invested by Legacy Opendoor investors.

132.    Importantly, the PIPE financing, which was largely supported by Defendants Wu, Wheeler, Bain, Palihapitiya, and Osborne, was entirely contingent on the closing of the Merger.

133.    Tellingly, the Defendants at SCH refused to obtain a fairness opinion from the Company's financial advisors, any independent valuation, or any advice by independent counsel in determining whether to proceed with the Merger and exchange hundreds of millions of its own shares in connection therewith.

134.    Instead, the Individual Defendants and the Sponsor and the Director-Defendants (defined below) relentlessly pushed investors to approve a deal that was worth little to nothing, and far less than what investors would have received had SCH liquidated as planned.

135.    Indeed, in lieu of a neutral assessment of the company's valuation, Legacy Opendoor provided SCH and its investors with a massive $5 billion valuation and further misled investors as they prepared to vote on the Merger.

136.    Despite this dreary reality, Defendants painted Opendoor as a market "disrupter" in the United States residential real estate market. These representations could not have been further from the truth.

137.    Far from a market "disrupter" with a "proprietary" AI algorithm, Legacy Opendoor was plagued with technological and practical challenges that inhibited Defendants from knowing or representing anything concrete about the Company's commercial viability. However, this did not stop Defendants from concocting a false image of Legacy Opendoor and its future prospects post-Merger.

138.    Basic due diligence would have revealed these issues and would have required a Company fiduciary to steer away from the value-destroying asteroid SCH was headed towards. The Individual Defendants did the opposite, proceeding full speed ahead without any indication that SCH's fiduciaries made any reasonable or basic investigation into Legacy Opendoor's affairs. Indeed, there is no indication that the SCH board ever held any meetings to discuss the substantive pros and cons for SCH shareholders of pursuing the Merger or received any written materials related to its diligence in connection therewith.

139.    Despite this, SCH and Legacy Opendoor executed the Merger Agreement. That same day, SCH and Legacy Opendoor issued a joint press release announcing the Merger Agreement. The Merger closed on December 17, 2020. Immediately after the

closing of the Merger, Defendants Wu and Wheeler received lucrative employment contracts, Defendant Palihapitiya, along with Defendants Bain, Osborne, Spillane, and Herman, received windfalls from their shared ownership of the then-converted Founder Shares, and Defendants Wu, Bain, Herman, Solomon, Kilar, Keffer, and Jaffe received directorships on Opendoor's Board, along with handsome benefits provided by the shareholders who approved the Incentive Plan.

140.     Proceeding with the Merger proved costly in numerous ways, including by exposing SCH, the Sponsor, and the other Defendants to several costly lawsuits against the Company, such as the Securities Class Action, among other things.

### *Legacy Opendoor's AI Algorithm Suffers from Significant Issues Requiring Human Input Both Before and After the Merger*

141.     Contrary to the Individual Defendants' representations both before and after the Merger, Legacy Opendoor and Opendoor were enduring hardships from AI algorithm issues and from the Company's use of fraudulent repair charges to maintain profitability.

142.     Indeed, despite representing to shareholders and the market that Legacy Opendoor had an algorithm that produced "fully automated home valuations," the Company's algorithm required human input and judgment, and was otherwise far afield from what the Individual Defendants portrayed to investors both before and after the Merger.

143.     The Securities Class Action interviewed eight separate employees of Legacy Opendoor, all of whom corroborated these circumstances. Two of the former employees interviewed worked for Legacy Opendoor well before the consummation of the Merger.

For example, CW-5, worked as an Acquisition Associate at Legacy Opendoor and Opendoor from November 2018 until March 2020. As an Acquisition Associate, CW-5 was responsible for pricing the initial offers the Company would distribute to customers. CW-5 stated that they were responsible for valuing any home that the AI algorithm could not properly value. According to CW-5, management would label certain properties that the AI algorithm could not value and would forward them to CW-5 for valuation. CW-5 maintains that the AI algorithm could not properly value approximately 50% of all the properties that needed valuation.

144.    In the same fashion, another former employee, CW-6, worked in a variety of roles at Legacy Opendoor and Opendoor, from 2018 until November 2022. CW-6 began work at Opendoor in Business Operations but later transitioned to Data Science Operations, where CW-6 worked for the Consumer team and later the Price team. CW-6 stated that the AI algorithm's initial price valuation was reviewed by human price analysts and portfolio managers. In their review of these prices set by the AI algorithm, CW-6 stated that the human price analysts and portfolio managers could change the initial offer prices.

145.    More former employees corroborated the practice of changing the AI algorithm's price after the Merger as well. CW-2, who worked as a Price Analyst for Opendoor from July 2021 to July 2022 in Phoenix. Arizona, stated that they priced homes in the southwestern region of the United States, including in Phoenix, Tucson, Prescott, Los Angeles, San Bernadino County, San Diego, San Francisco, Sacramento, Portland, Boise, Albuquerque, Las Vegas, and Reno. CW-2 stated that "the automated system was

never accurate" and that "it had a lot of flaws. A lot."

146.    CW-2 further stated that Opendoor's Pricing Analysts, including the managers, did not trust the AI algorithm's ability to determine accurate home pricing offers. Signaling their discomfort with the AI algorithm's shortcomings, CW-2 stated that both of their managers, the Pricing Escalation Managers in the Western United States, warned CW-2 and the other Pricing Analysts not to rely on the AI algorithm's prices.

147.    This practice was inculcated in Pricing Analysts from the start of their employment with Opendoor. According to CW-2, the managers instructed them, "Don't look at what the system is coming in at." This was done so that Pricing Analysts would not be biased by the AI algorithm's prices: "What the automated system gave out, don't anchor to it because it's not going to be correct." Instead, Pricing Analysts like CW-2 were told to use their own personal judgment based on the data available. For instance, during the early summer 2022, Pricing Analysts, including CW-2, were told to adjust home prices in the Las Vegas, Nevada area market because the AI algorithm was significantly overpricing properties there. CW-2 stated that in this instance, "[t]he automated system offers were just insane offers that any seller would say yes, I'll take it right away."

148.    In most instances, the AI-generated prices would be too high, so CW-2 would have to submit prices much lower. CW-2 stated that about 90% of the final price offers they submitted for about 4,000 properties were priced under the AI algorithm price. Sometimes, the AI algorithm would generate a pricing figure that would be much higher than allowed under a certain market's pricing cap, which required a Pricing Analyst, like CW-2, to personally modify the price.

149.    In all, CW-2 maintained that Opendoor did not generally rely on the AI algorithm to issue final priced offers on properties. Instead, the Company used human Price Analysts to make these important decisions, just like any other traditional real estate entity would. CW-2 stated that the only time when Opendoor fully used, or "turned on," the AI algorithm was when the Company faced a significant backlog of pricing, like when more than one thousand homes needed a price quickly. According to CW-2, this was generally done about three to four times a month to just "to help us clear out" the backlog and the "majority (of final offers) were human-made offers."

***Individual Defendants Complete a Secondary Public Offering Which Further Deceives Investors***

150.    On February 9, 2021, the Company completed a secondary public offering (the "February 2021 Secondary Offering"). The February 2021 Secondary Offering sold 32,817,421 shares of Company common stock at an offering price of $27.00 per share, providing about $886 million in gross proceeds for the Company. After underwriting fees and discounts were deducted, the Company received about $859.5 million in net proceeds from the February 2021 Secondary Offering.

151.    Unfortunately, as demonstrated through the success of the Merger and the February 2021 Secondary Offering, investors and analysts wholeheartedly believed the Individual Defendants that Opendoor's AI algorithm made the Company unique and strong in a crowded market. On August 2, 2021, InvestorPlace released an article titled, "Opendoor Is a Real Estate Disruptor," which heralded Opendoor's AI algorithm, stating the following:

One of the main reasons for Opendoor's success is its robust pricing algorithm. It's not looking to buy at very low prices and sell at very high prices, but instead seeks to identify the highest price that it can pay for a home and still generate a profit. Because its competitors — Zillow (NASDAQ:Z) and Offerpad — do not possess such pricing engines, they have been forced to charge more than Opendoor for their homes to make the same profit on them.

152.    On August 12, 2021, Wedbush added Opendoor after it had "another strong quarter" to the "Wedbush Best Ideas List" and stated in their analyst report that Opendoor's "pricing capabilities let it optimize acquisition and resale across all market conditions. Opendoor's pricing capabilities have been best in class, and we believe its vast data is a significant asset."

153.    On September 8, 2021, *Seeking Alpha* went even further, writing in an article titled, "Opendoor: The Mythology of Disruption," that "Opendoor's pricing algorithm, or AVM, is the secret sauce; the performant soul of iBuying." The article fully backed Opendoor, stating that "Opendoor's [algorithm] is the best in the business – a first of its kind machine-learning platform that actively ingests historical pricing information alongside hundreds of datapoints per home, customized within each market to arrive at a fair price."

### Zillow Shutters its Own iBuying Business

154.    On November 2, 2021, just less than two months after the *Seeking Alpha* report praising Opendoor's AI algorithm, Zillow, Opendoor's largest competitor, announced that it would shutter its iBuying business because it could not accurately determine housing prices. Zillow's CEO stated in a press release that "***fundamentally, we have been unable to predict future pricing of homes to a level of accuracy that makes***

61

*this a safe business to be in*." (Emphasis added.) The market grew concerned over Zillow's announcement, with Opendoor's common stock falling more than 14.5% the next day following the news. Investors and analysts eagerly awaited Opendoor's upcoming earnings report for the third quarter of 2021 given Zillow's demise.

155.    The long-awaited news came just eight days later, on November 10, 2021. During an earnings call that day, Defendant Wheeler unequivocally told investors that the Company's AI algorithm was "highly responsive" to macroeconomic conditions in the housing market, stating that "Important is that our model really works in upmarkets, it's going to work in flat markets, it's going to work in downmarkets." Also on the call, when asked a question about Opendoor's pricing models, Defendant Wu responded that pricing was "something that we treat [a]s proprietary and a large competitive mode that compounds as we get to scale overtime. And so I would just say that since we started Opendoor, this has been core and foundational to the business."

156.    Sadly, investors believed the Individual Defendants' representations made in the earnings call, boosting Opendoor's price per share back up 15.5% the following trading day, from a closing price of $19.52 per share on November 10, 2021 to close at a price of $22.56 per share on November 11, 2021. Moreover, Oppenheimer, in an analyst report published on November 11, 2021, described Opendoor as the industry's leader, raising its price "target to $28 from $25 after OPEN reported better 3Q21 results/Q4 outlook and is *clearly positioned to be the vertical leader in the transition of home transacting online*." (Emphasis added.)

157.    Just five days later, on November 16, 2021, Defendant Wu, seizing the

opportunity, sold 1.6 million shares of Company stock, taking personal proceeds in excess of $35 million in a single day. On November 17, 2021, he sold another 628,348 shares, taking personal proceeds in excess of $13 million. On November 18, 2021, he unloaded 443,182 more shares, taking personal proceeds in excess of $9 million. In all, in just a three-day period and less than one week after Defendant Wheeler's false statements assuring investors about Opendoor's AI algorithm, Defendant Wu made over $57.6 million while the Company's stock traded at artificially inflated prices.

### *The FTC Investigation Brings the True Extent of Human Judgment and Fraudulent Repair Business Practices to Light*

158.    On August 18, 2019, the FTC issued a Civil Investigative Demand ("CID") to Legacy Opendoor as part of its non-public investigation into "whether [Opendoor] . . . has deceptively marketed home-buying services in violation of Section 5 of the FTC Act, 15 U.S.C. § 45, and whether Commission action to obtain monetary relief would be in the public interest." The CID asked for a response from Legacy Opendoor within 14 days. It also contained interrogatories such as "Describe the Company's method for determining what repairs it requires for the homes on which it had made an offer" and "Describe the Company's method for calculating the repair costs deducted from the price of a home it purchases." The CID also contained document requests including "Documents sufficient to show each materially different version of the Company's policies regarding: (i) calculating offers to purchase homes; . . . [and] (c) assessing repairs that the Company will require homeowners to make or pay for as a condition of the Company purchasing their homes." Lastly, the CID mandated that Legacy Opendoor "designate and make available

one or more officers, directors, or managing agents, or others who consent, to testify on its behalf" regarding "[t]he Company's compliance with consumer protection laws and policies, practices, and procedures concerning compliance."

159.    On December 23, 2020, the FTC told Opendoor that the FTC would pursue an enforcement action against the Company if a settlement was not reached. Almost two years later, on August 1, 2022, the FTC issued a press release that revealed the agency had reached a settlement with Opendoor for $62 million and would be releasing the FTC Complaint to the public. The FTC Complaint revealed that for more than two years, dating back to well before the Merger, the FTC investigated Legacy Opendoor (and following the Merger, the Company) for use of fraudulent business practices, including the implementation of exaggerated repair costs and extensive human input in the pricing of the Company's homes. Moreover, the FTC found that Opendoor's prices were determined by humans, and that one of the Company's main performance metrics, contribution margin, was the product of human judgment and, thus, did not come from any unique strength of the Company's "proprietary" AI algorithm. In relevant part, the FTC revealed the following:

> The complaint alleges that Opendoor engaged in practices that both increased the costs to customers and reduced offers to below market value. Opendoor's approach to home repairs is one example. The company told prospective customers that after an in-person assessment of the property, it may require them to make or pay for certain repairs. However, Opendoor also said that it 'ask[s] for the repairs we anticipate the next buyer of the home will ask for' – fixes that customers would have to address before a traditional sale, too. Opendoor further claimed that consumers may even save money on repairs if they sell to Opendoor because 'we do our best to pass wholesale savings on to you from our partnerships with local vendors.'

But according to the FTC, Opendoor's required repairs often cost thousands more than what people would have to pay before a traditional sale.

160.    Further, the FTC found that Opendoor had an internal practice of manually changing prices that were generated by the AI algorithm. In particular, the FTC stated that "Opendoor took various steps to reduce offers below what their internal valuation system deemed to be a home's market value." Around August 2018, according to the FTC, the Company started manually reducing home prices without telling customers, or investors, the prices were less than market value. The FTC stated that Opendoor's AI algorithm *could* generate offers, but that "[i]n many instances, *Opendoor's employees have manually adjusted these values before presenting them to consumers as offers*." (Emphasis added.)

161.    The FTC also determined that the Company completed "internal analyses" on their employees' "manually adjusted" pricing, stating that "Opendoor's internal analyses showed that these manually adjusted offers were several percentage points below Opendoor's assessment of market value" and explained that "[b]eginning no later than 2019, Opendoor instituted a policy to reduce its manually adjusted offers to [redacted] below what Opendoor assessed as market value."

162.    Notably, the FTC even reviewed an "internal communication [which] stated bluntly, 'We don't offer a fair market value to our customers.'"

163.    On another front, the FTC found that Opendoor did business by issuing fraudulent repair invoices to sellers and then did not make the repairs the Company stated they would complete. The FTC revealed that "Opendoor has sent consumers a list of

required repairs with the cost it would charge consumers if they agree to deduct the costs from their sales proceeds. ***The list of repairs has been typically well beyond what consumers would be responsible for in a market sale***." (Emphasis added.) The FTC noted that many of these repairs were not really needed, stating "Opendoor has routinely requested upgrades to, or replacement of, functional heating and cooling systems, flooring, and roofs. It has also frequently demanded cosmetic changes such as repainting and replacement of items that could be repaired at far lower cost."

164.    Making matters worse for sellers, the FTC stated that Opendoor can take up to eighteen days after the Company makes an initial offer to furnish a list of repairs to the seller, thereby locking the seller in limbo since sellers had already paid deposits on their new homes. According to the FTC, "Opendoor's internal communications have described the lag between the initial offer and the later, significantly lower offer as a ***'bait-and-switch' operation***." (Emphasis added.)

165.    The FTC also stated that the Company would keep the superfluous repair money as surplus profit from the sale of the home, stating the following:

> If the consumer decides to authorize Opendoor to complete the repairs and deduct the estimated costs from the sale proceeds, Opendoor completes the repairs after it acquires the property. ***If the repairs cost less than the amount deducted, Opendoor retains the excess as profit***, including the undisclosed Estimated Repair Credit that Opendoor deducted from its original offer.

(Emphasis added).

166.    Indeed, the FTC stated that "[o]ne internal study found that for [redacted] of Opendoor's purchases, its deductions for repair costs were greater than Opendoor's actual costs, thereby 'taking away [redacted] of seller equity' in each of those sales."

66

167.    The FTC additionally determined that Opendoor did business, and improved contribution margin, by buying homes for low prices and selling them for significantly higher prices. In relevant part, the FTC revealed the following:

> Opendoor claimed that it did not make money from 'buying low and selling high,' but from 'charging a fee for [its] service.' But gains from selling homes for more than its offer price are a key contributor to its revenue. A 2019 financial analysis broke down revenue from Opendoor's fee and from 'net resale gain' and reported over [redacted] in resale gains in 2018 and [redacted] in project resale gains in 2019. Presentations to investors touted 'resale gain' as a significant contributor to Opendoor's revenue per home.
>
> Data from Opendoor's real estate transactions confirm that Opendoor makes money not just from its fees, but also from buying homes low and selling them high. After purchasing homes, it lists them on the open market for resale. From 2016 through February 2020, Opendoor sold [redacted] percent of its homes for more than what it offered consumers. The average gain on these homes was [redacted], or [redacted] percent of the homes' average offer price of [redacted].

168.    As part of the settlement agreement, Opendoor agreed to pay $62 million to the FTC. Samuel Levine, the Director of the FTC's Bureau of Consumer Protection, stated in the FTC's press release accompanying the settlement that "Opendoor promised to revolutionize the real estate market but built its business using old-fashioned deception about how much consumers could earn from selling their homes on the platform. There is nothing innovative about cheating consumers."

169.    The FTC's August 2022 revelations show that Opendoor's pricing was not controlled by "proprietary, machine learning-based pricing models," but was instead controlled by human judgment and had been improperly adjusted based on fraudulent consumer practices. Additionally, Opendoor did not generate margins from "the spread between acquisition price and resale price," but instead made "gains from selling homes

for more than its offer price" and these "gains…are a key contributor to its revenue."

170.    More former employees in the Securities Class Action corroborated the FTC's determinations that Opendoor lowballed prices to purchase homes from sellers by generally charging sellers for repairs so that the Company could lower its final offer price and then proceed to not make the repairs. Indeed, as the housing market shifted and swayed throughout 2022, Opendoor's AI algorithm struggled to respond; as a result, Opendoor increased its fraudulent repair practices to maintain revenue, contribution margin, and overall performance.

171.    According to CW-4, who worked as an associate in the finance department at Opendoor Home Loans from December 21, 2020 until November 3, 2022, Opendoor changed how it conducted its repair policy at some point in 2020. CW-3, who worked as a customer experience partner at Opendoor from March 2021 to November 2022, dealt directly with customers and worked with them to obtain an offer from Opendoor. CW-3 stated that "We didn't do every single repair we accounted for."

172.    Generally, customer experience partners such as CW-3 walked customers through all steps of the Opendoor home-selling experience. Customer experience partners would hold a Zoom interview with the customers, discuss the customer's needs, conduct a customer-guided video tour of the home (which was recorded), and dispatch a physical team to actually visit the home to assess the area and the home's exterior condition itself. After conducting these assessments, Opendoor then made the customer an offer on their house, which the Company would subtract repair costs from.

173.    Importantly, customer experience representatives did not provide customers

with an itemized list of specific repairs and their corresponding individual costs, but instead only verbally summarized the repair lists. CW-3 stated that this was done at the request of managers but believed the managers were told to implement this practice by their superiors.

174.    CW-3 stated that Opendoor creates a list of repairs based upon what the Company thinks the buyer would ask for, such as a new furnace or new air conditioning unit. However, if the seller does not inquire about the repairs, or Opendoor does not complete the repairs, Opendoor simply "pockets the money" whether the repairs are completed or not.

175.    CW-3 further explained that when they first started at Opendoor, repair costs were much smaller, with an average repair price of around $5,000. However, by the time CW-3 left Opendoor in November 2022, the repair charges ballooned, reaching "$15,000, $25,00, $30,000, big numbers."

176.    Several of CW-3's fellow co-workers also noticed the tremendous rise in the price of repairs, with some exclaiming disbelief at the number of expensive repairs, while others, including CW-3, challenged Opendoor's home team who made the price list "probably once or twice a day."

***Opendoor's AI Algorithm is Unable to Adjust to Changes in the 2022 Housing Market***

177.    As a result of its reliance on human judgment in making price estimates, Opendoor's AI algorithm could not properly interpret, respond, or adjust to macroeconomic changes in the housing market.

178.   CW-4 maintained that by midway through 2021, during a Monthly Business Review call, Company employees expressed concern over how long Opendoor's homes were left on the market in some "problematic" states and noted that their prices were falling. CW-4 worked in the Arizona region and was experiencing these issues, stating that by the end of the 2022 Fiscal Year, homes in all of CW-4's markets were on the market much longer than expected due to a stiff rise in interest rates, which the Company had not anticipated.

179.   Opendoor suffered from the same issues in central and southern California. According to CW-1, who was charged with reviewing Opendoor's performance with more than 100 homes in the San Francisco and Southern California markets, Opendoor "did not know" the market and was overpricing its homes, thereby causing the Company to retain them longer. CW-1 further stated that the reason Opendoor overpriced its properties was due to the AI algorithm which was unable to respond to market changes. CW-1 even expressed to Opendoor's General Manager of Reselling that changes should be made to how the Company conducts its operations in the area, but the General Manager of Reselling told CW-1 that "this is how Opendoor does it."

180.   Importantly, the Individual Defendants were repeatedly made aware of this issue at Company conferences and openly discussed it. For instance, CW-7, who worked for Opendoor from November 2021 until September 2022 as a Senior Loan Officer, and who had previously worked for one of Opendoor's competitors, RedDoor, from April 2021 to November 2021 (when Opendoor acquired RedDoor), stated that Opendoor normally held company-wide video conferences, led by Defendants Wu and Wheeler, on

Zoom and Google. CW-7 maintains that Defendants Wu and Wheeler's attitudes changed halfway through 2022 to "long faces." By July 2022, Defendant Wu and Wheeler told employees that the Company had to "quickly unload" properties because inventory was costing the Company too much. Defendant Wheeler, according to CW-7, went as far as to say that "***We'll take anything right now***," meaning that Opendoor would take any home offer they could find in order to unload excess inventory. (Emphasis added.)

181.    CW-8 corroborated CW-7, stating that sometime in July or August 2022, during a company-wide conference call, Defendant Wheeler told Company employees that Opendoor's focus was to "to lower the DIP," which stood for "Days In Possession." After this call, CW-8 stated that Defendant Wheeler and others at the Company began changing models so that Opendoor could unload inventory faster.

182.    On the same note, CW-3 remembered a meeting that occurred halfway through 2022, during which it was made clear by Opendoor leaders that "the longer we held the inventory, the more money we lost, and less profit we made when we could turn around and sell those homes again."

183.    CW-7 also stated that during an August 2022 video conference call, Defendant Wheeler instructed employees to give credits and other incentives to "outside assets," which included real estate agents and home mortgage companies to further unload inventory. CW-7 personally worked on several of these incentive-sweetened deals, which featured additional percentages given to outside brokers who identified home buyers, that ended in sale, $2,000 lender credit, and free appraisals, among other things.

184. CW-1 saw these concessions made with the help of outside brokers in practice as well. CW-1 stated that, for inventory sitting in the San Francisco area for long periods of time, the Company enlisted outside brokers to personally list and sell the properties with enhanced photos and better descriptions. CW-1 stated that this practice would cost Opendoor a 2% fee.

185. Opendoor's inventory issues extended through September 2022. At that time, according to CW-7, Defendant Wu and Wheeler held a video conference with employees during which Defendant Wheeler admitted "seeing depreciated assets" with high inventory and to "move the properties." CW-7 stated that some who attended the call expressed concern that the Company was paying too much for the houses it was buying and was not completing repairs.

**False and Misleading Statements**

***November 30, 2020 Merger Proxy Statement***

186. On November 30, 2020, the Company filed the Merger Proxy Statement with the SEC in connection with the Merger. The Merger Proxy Statement was solicited by Defendants Palihapitiya, Osborne, Spillane, Wu, Wheeler, Bain, Herman, Jaffe, Keffer, Kilar, and Solomon pursuant to Section 14(a) of the Exchange Act. Defendants Palihapitiya, Osborne, Spillane, Wu, Bain, Herman, and Solomon also signed the Merger Proxy Statement, which contained materially misleading elements.

187. The Merger Proxy Statement requested Company shareholders to vote to, *inter alia*: (1) approve the Merger; (2) approve four separate proposals to make material differences between SCH's Amended and Restated Memorandum and Articles of

Association (as may be amended from time to time, the "Cayman Constitutional Documents") and the proposed certificate of incorporation and bylaws of Opendoor Technologies (collectively, the "Organizational Documents Proposals"); (3) elect Defendants Wu, Keffer, Solomon, Kilar, Jaffe, and Herman as directors; (4) approve a proposal for the PIPE financing; (5) approve a proposal to adopt the Incentive Plan; and (6) approve and adopt Opendoor Technologies Inc. 2020 Employee Stock Purchase Plan (the "Employee Stock Plan") (collectively, the "Merger Proposals").

188.    The purpose of the Incentive Plan was to "enhance [the Company's] ability to attract, retain and motivate persons who make (or are expected to make) important contributions by providing these individuals with equity ownership opportunities and/or equity-linked compensatory opportunities." If approved by shareholders, the Incentive Plan would have allowed for approximately 43.5 million shares of post-Merger Company stock to be available for issuance as compensation to the Company's officers and directors, including various of the Individual Defendants.[11]

---

[11] The Merger Proxy Statement notes that "[t]he aggregate number of shares of our common stock that will be available for issuance under the [Incentive] Plan will be equal to the sum of (i) 43,508,048 shares (8% of the total number of issued and outstanding shares of Opendoor [] common stock as of immediately after the Closing) of Opendoor [] common stock and (ii) an annual increase on the first day of each calendar year beginning January 1, 2022 and ending on and including January 1, 2030 equal to the lesser of (A) a number equal to the excess (if any) of (1) 5% of the aggregate number of shares of Opendoor [] common stock outstanding on the final day of the immediately preceding calendar year over (2) the number of shares of Opendoor [] common stock then reserved for issuance under the [Incentive] Plan as of such date and (B) such smaller number of shares of Opendoor [] common stock as is determined by our board."

189.    Pursuant to the Incentive Plan, awards may be granted until the tenth anniversary of the Incentive Plan's effective date, which is September 15, 2033, unless either the Board or one of the committees it delegates terminates the Incentive Plan before then. Further, the Incentive Plan includes an annual limit for each non-employee director's total compensation. Under the Incentive Plan, the grant date fair value of shares of common stock subject to any award granted to a non-employee director in any calendar year may not exceed $1,000,000. The Company's officers and directors have received and continue to receive lucrative compensation, while numerous of them made false and misleading statements, during and after the solicitation of the Merger Proxy Statement. These officers and directors would not have received this lucrative compensation pursuant to the Incentive Plan had certain of them made false and misleading statements in the Merger Proxy Statement, as the shareholders would not have approved the Merger, and thus, the Incentive Plan, had they known the truth about Opendoor. In total to date, the Company has paid over $659 million (detailed in the chart below) to its officers and directors pursuant to the Incentive Plan as a result of shareholders approving the Incentive Plan under false pretenses.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### AMOUNTS RECEIVED UNDER THE OPENDOOR TECHNOLOGIES INC. 2020 INCENTIVE PLAN[12]

| Individual | 2020 | 2021[13] | 2022 | Subtotals |
|---|---|---|---|---|
| **John Rice**, defendant, Director | - | $584,201 | $165,552 | $749,753 |
| **Carrie Wheeler**, defendant, CEO/former CFO/ Director | $50,060,723 | - | - | $50,060,723 |
| **Christina Schwartz**, non-party, Interim CFO/ Chief Accounting Officer ("CAO") | - | - | $1,826,185 | $1,826,185 |
| **Eric Wu**, defendant, former CEO/ President, Marketplace/Director | $370,051,408 | $111,598,143 | - | $481,649,551 |
| **Sydney Schaub**, non-party, Chief Legal Officer ("CLO") | - | - | $4,379,219 | $4,379,219 |
| **Andrew Low Ah Kee**, non-party, former President | - | $112,546,679 | - | $112,546,679 |
| **Elizabeth Stevens**, non-party, former Head of Legal | - | $5,643,000 | - | $5,643,000 |
| **Adam Bain**, Defendant, Director | - | $282,986 | $165,899 | $448,885 |

---

[12] Includes amounts received under the Plan by the Individual Defendants and other individuals at the Company between December 17, 2020, the date that shareholders approved the Plan, to the present, rounded to the nearest whole dollar as appropriate.

[13] Amounts in this column for John Rice, Adam Bain, Cipora Herman, Jonathan Jaffe, Pueo Keffer, Jason Kilar, and Glenn Solomon include compensation for the 2021 Fiscal Year and pro rata compensation for the period from the completion of the Merger until the end of the 2020 Fiscal Year.

| | | | | |
|---|---|---|---|---|
| **Cipora Herman**, Defendant, Director | - | $636,877 | $165,970 | $802,847 |
| **Jonathan Jaffe**, Defendant, Director | - | $206,622 | $163,986 | $370,608 |
| **Pueo Keffer**, Defendant, Director | - | $274,421 | $165,695 | $440,116 |
| **Jason Kilar**, Defendant, Director | - | $274,421 | $165,695 | $440,116 |
| **Glenn Solomon**, Defendant, Director | - | $280,077 | $165,827 | $445,904 |
| | | | **TOTAL** | **$659,803,586** |

190.    The Merger Proxy Statement represented that Legacy Opendoor had algorithms that accurately priced residential real estate, stating the following, in relevant part:

Pricing accuracy.    Our unique data works in concert with our pricing algorithms. These algorithms use machine learning to drive pricing decisions through demand forecasting, outlier detection, risk pricing, and inventory management. Over time, we have improved the pricing accuracy of our models as we add new data inputs and refine model logic, improvements that compound with experience and scale. As we have continued to demonstrate improving accuracy, we have also been able to increase our number of fully automated home valuations.

Advancements in model sophistication have accelerated our feedback loops, such that our systems can dynamically adjust to leading market indicators and react to real-time macro- and micro-economic conditions. Our pricing algorithms are designed to dynamically adjust to leading indicators and market conditions so that the business can react to real-time economic conditions. This responsiveness is critical to pricing accurately and maintaining margins, especially in periods of volatility.

191.    The Merger Proxy Statement also represented that the following reasons

supported SCH's board of directors' decision to enter the Merger Agreement and recommend the Merger with Legacy Opendoor:

**Opendoor's Superior Consumer Experience and Growing Customer Base.** The digital experience created by Opendoor's product is transforming a highly inefficient process. Today, 89% of home buyers and sellers use an agent and the process for buying and selling a single-family home is complex, uncertain, time-consuming and offline. Opendoor's platform introduces greater simplicity (pursuant to its integrated digital experience), safety (transactions using Opendoor are contactless and do not require the seller to host open houses or in-person visits from multiple potential buyers), certainty and speed (with flexible closings in little as 14 days, compared with an average of 87 days to close in a traditional sale). As a result, customers enjoy selling their homes through Opendoor (based on Net Promoter Scores). Further, given the approximately 72 million, digitally-native millennials that are beginning to start families and enter the housing market, the SCH board of directors expects that customer demand for Opendoor's product will continue to increase.

**Opendoor's Efficient and Scalable Business Model.** Opendoor has a highly efficient platform to buy and sell real estate. Opendoor applies technology to reduce costs through centralization and automation and is able to achieve economies of scale not available to traditional agents, creating savings that can be passed along to Opendoor's customers. The more transactions Opendoor completes, the more refined and cost-efficient its products are expected to become, which the SCH board of directors expects to, in turn, continue to increase customer demand while also increasing Opendoor's margins.

**Opendoor's Rapid Growth and Expansive Future Opportunities.** Opendoor is already a leader in the ability to buy and sell a consumer home online and has a demonstrated ability to grow rapidly and efficiently through its centralized customer operations, scalable pricing systems and small, efficient in-market launch teams. Opendoor also anticipates continued revenue growth and margin improvement through market penetration and adjacent services. Today, Opendoor operates in 21 U.S. markets with plans for future expansion into additional markets across the country. In terms of adjacent services, Opendoor has already launched title insurance and escrow services and certain financing services, and plans to launch additional value-added services in the future which the SCH board of directors expects will increase contribution margin and profits over time.

192.    The statements in ¶¶ 190-191 above were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading. Specifically, they failed to disclose that: (1) Legacy Opendoor's pricing algorithm posed a significant risk to the Company, as the algorithm was not automated but rather required human intervention and was therefore unable to timely respond to macroeconomic changes in the housing market; and (2) Legacy Opendoor was engaged in fraudulent consumer practices, including overcharging its customers for home repairs that the company thereafter failed to perform. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

193.    Regarding the due diligence the SCH board took with respect to investigating Legacy Opendoor prior to the completion of the Merger, the Merger Proxy Statement also represented the following:

> In analyzing the Business Combination, the SCH board of directors and management conducted due diligence on Opendoor. The SCH board of directors reviewed comparisons of selected financial data of Opendoor with its peers in the industry and the financial terms set forth in the Merger Agreement, and concluded that the Business Combination was in the best interest of SCH's shareholders.

194.    Under the section titled "Results of Due Diligence," the Merger Proxy Statement stated that "the SCH board of directors considered the scope of the due diligence investigation conducted by SCH's senior management and outside advisors and evaluated the results thereof and information available to it related to Opendoor" including:

> (a)    extensive virtual meetings and calls with Opendoor's management team regarding its operations, projections and the proposed transaction; and

(b)    review of materials related to Opendoor and its business, made available by Opendoor, including financial statements, material contracts, key metrics and performance indicators, benefit plans, employee compensation and labor matters, intellectual property matters, real property matters, information technology, privacy and personal data, litigation information, environmental matters and other regulatory and compliance matters and other legal and business diligence.

195.    The statements referenced in ¶¶ 193-194 above were materially false and misleading because SCH misrepresented its due diligence efforts of Legacy Opendoor by exaggerating that it had conducted proper due diligence of Legacy Opendoor prior to completion of the Merger. In reality, Legacy Opendoor was a company without an industry-altering AI home pricing algorithm that could boost contribution margins in any housing market conditions. Instead, Legacy Opendoor relied upon human judgment in pricing homes, just like any other real estate business. Making matters worse, Legacy Opendoor also engaged in fraudulent business practices such as charging customers for repairs that the Company never completed, all in an effort to mask lost profits which resulted from the poor performance of the Company's algorithm and artificially inflate its contribution margin .

196.    The Merger Proxy Statement also misrepresented the value of SCH shares leading up to the Merger by representing that each SCH share was worth $10.00. The Merger Proxy Statement represented to investors that the aggregate value of the consideration to be paid by SCH in the Merger was approximately $5 billion through the issuance of approximately 560,005,000 shares of "New Opendoor" common stock issued by SCH valued at $10.00 per share. In particular, the Merger Proxy Statement provided the following consideration calculation that valued each SCH share at $10.00:

As a result of and upon the closing of the Merger (the "Closing"), among other things, all outstanding shares of Opendoor common stock (after giving effect to Opendoor Preferred Conversion, Opendoor Warrant Settlement and the Convertible Note Exchange , as more fully described elsewhere in this proxy statement/prospectus) as of immediately prior to the effective time of the Merger and, together with shares of Opendoor common stock reserved in respect of Opendoor Awards outstanding as of immediately prior to the Closing that will be converted into awards based on Opendoor Technologies common stock, as more fully described elsewhere in this proxy statement/prospectus, will be cancelled in exchange for the right to receive, or the reservation of, an aggregate of 500,000,000 shares of Opendoor Technologies common stock (at a deemed value of $10.00 per share), which, in the case of Opendoor Awards, will be shares underlying awards based on Opendoor Technologies common stock representing a pre-transaction equity value of Opendoor of $5.0 billion (the "Aggregate Merger Consideration"). The portion of the Aggregate Merger Consideration reflecting the conversion of the Opendoor Awards is calculated assuming that all Opendoor Technologies Options are net-settled (although Opendoor Technologies Options may by their terms be cash-settled, resulting in additional dilution). The Aggregate Merger Consideration does not take into account certain additional issuances (i) to the Opendoor PIPE Investors pursuant to the PIPE Investment which may be made under the terms of the respective Subscription Agreements or (ii) to Opendoor management and employees pursuant to the 2020 Incentive Plan and Management Awards (as defined in the Incentive Award Plan Proposal).

197. The Merger Proxy Statement also described certain SCH related party transactions concerning the Founder Shares and Private Placement Warrants, stating the following, in relevant part:

***Founder Shares***

In January 2020, the Sponsor purchased 8,625,000 SCH Class B ordinary shares for an aggregate purchase price of $25,000, or approximately $0.003 per share (after a subsequent share capitalization on April 27, 2020) (the "founder shares"). In March 2020, the Sponsor transferred 100,000 founder shares to each of David Spillane and Cipora Herman (two of SCH's independent directors) at their original per-share purchase price. On April 27, 2020, SCH effected a pro rata share capitalization resulting in an increase in the total number of founder shares outstanding from 8,625,000 to 10,350,000 in order to maintain the ownership of founder shares at 20%

of the issued and outstanding ordinary shares of SCH upon consummation of its initial public offering. The Sponsor received 1,725,000 founder shares in the share capitalization as a result of our independent directors waiving their right to receive shares in the share capitalization.

***Private Placement Warrants***

Simultaneously with the consummation of the initial public offering of SCH, the Sponsor purchased 6,133,333 warrants to purchase one SCH Class A ordinary share at an exercise price of $11.50 (the "private placement warrants") at a price of $1.50 per warrant, or $9.2 million in the aggregate, in a private placement. Each private placement warrant entitles the holder to purchase one SCH Class A ordinary share for $11.50 per share. A portion of the proceeds from the sale of the private placement warrants was placed in the trust account of SCH. The private placement warrants may not be redeemed by us so long as they are held by the Sponsor or its permitted transferees. If the private placement warrants are held by holders other than the Sponsor or its permitted transferees, the private placement warrants will be redeemable by us and exercisable by the holders on the same basis as the warrants included in the units that were sold as part of the initial public offering of SCH. The Sponsor, or its permitted transferees, has the option to exercise the private placement warrants on a cashless basis.

198.     The statements referenced in ¶¶ 196-197 above were materially false and misleading because SCH failed to disclose that the entire SCH board had deep financial ties to the Founder Shares. Even Defendants Herman and Spillane, whom SCH represented to be independent directors, each held 100,000 Founder Shares, which would net each of them $1,000,000 if the Merger was successfully effectuated before SCH's deadline to effectuate a business combination. Because SCH's board consisted entirely of directors who had conflicts of interest relating to the Founder Shares, SCH's board could not form a special committee consisting of truly disinterested and independent directors to evaluate the fairness of the Merger.

199.    The Merger Proxy Statement explicitly maintained that SCH's board unanimously supported the Merger and found that the transactions solicited in the Merger Proxy Statement were in "the best interests" of SCH and its stockholders. The SCH board unabashedly recommended that shareholders approve the transactions contemplated in the Merger Proxy Statement.

200.    The misrepresentations and omissions set forth herein were material to shareholders in voting on the Merger Proposals who would not have approved the Merger Proposals had they been informed about the Overpayment Misconduct and the true state of affairs at the Company and Legacy Opendoor.

201.    Due to the false and misleading elements of the Merger Proxy Statement, Company shareholders voted to: (i) approve the Merger; (ii) elect Defendants Wu, Keffer, Solomon, Kilar, Jaffe, and Herman to Opendoor's Board, allowing them to make false and misleading statements; (iii) approve the NYSE Proposal; and (iv) approve the Incentive Plan, which thereafter allowed various of the Individual Defendants to materially benefit from the false and misleading statements contained in the Merger Proxy Statement.

202.    Given the lack of appropriate and accurate disclosures in the Merger Proxy Statement, SCH shareholders were unable to evaluate what they would receive in connection with any investment in the post-Merger Company. As many would come to know, those that failed to redeem their shares were duped into investing in a Company with little to no value.

### December 21, 2020 Registration Statement

203.    On December 21, 2020, before the market opened on the first day of

Opendoor public trading, Opendoor filed a registration statement on Form S-1 with the SEC (the "Registration Statement"), which was signed by Defendants Wu, Wheeler, Bain, Herman, Keffer, Solomon, Kilar, and Jaffe. The Registration Statement stated that Opendoor's "algorithms use machine learning to drive pricing decisions through demand forecasting, outlier detection, risk pricing, and inventory management" and that the Company's "***pricing algorithms are designed to dynamically adjust to leading indicators and market conditions so that the business can react to real-time economic conditions***." (Emphasis added.)

204.    The Registration Statement also stated that Opendoor's pricing algorithm was the driver of Opendoor's profitability, noting that its "proprietary, machine learning-based pricing models are key to our ability to acquire and resell thousands of homes per month accurately, profitably, and with increasing levels of automation."

205.    The Registration Statement also stated the following regarding Opendoor's AI algorithm:

> Proprietary offline data. We have conducted over 150,000 home assessments during which we collect over 100 data points on each home and its surroundings. We have invested in building custom inspection and operator tooling to systematically source and translate home features into a robust data library. Once we have purchased a home, we can collect additional proprietary home-level data through visitor feedback, visitor traffic and duration of visits. These proprietary data points have led us to make over one billion annotations and corrections to Multiple Listing Services ("MLS") and tax assessor data, as well as build out new, non-traditional geospatial data assets, such as power line proximity and road noise level. The additional home level data we collect from local vendors provides structured feedback on each home and further strengthens our data moat. Pricing accuracy. Our unique data works in concert with our pricing algorithms. These algorithms use machine learning to drive pricing decisions through demand forecasting, outlier detection, risk pricing, and

inventory management. Over time, we have improved the pricing accuracy of our models as we add new data inputs and refine model logic, improvements that compound with experience and scale. As we have continued to demonstrate improving accuracy, we have also been able to increase our number of fully automated home valuations.

Advancements in model sophistication have accelerated our feedback loops, such that our systems can dynamically adjust to leading market indicators and react to real-time macro- and micro-economic conditions. Our pricing algorithms are designed to dynamically adjust to leading indicators and market conditions so that the business can react to real-time economic conditions. This responsiveness is critical to pricing accurately and maintaining margins, especially in periods of volatility.

206.    The Registration Statement also discussed the importance of the Company's proprietary technology to the Company's ability to generate revenue, stating the following:

In order to finalize our offer, we conduct a free assessment to confirm all of the home details and identify any repairs that may need to be performed. We have developed purpose-built software to guide home assessment workflows and collect over 100 unique data points regarding a home's condition and quality, which we incorporate as structured data into our underlying pricing models. Once completed, we finalize our offer, taking into consideration any necessary repairs, and produce the purchase agreement for the seller. Our objective is to provide a competitive cash offer to sellers and we believe this approach builds trust with our potential customers. Our business model is designed to generate margins from our service charge to sellers and ancillary products and services associated with a transaction, and not from the spread between acquisition price and resale price.

***February 4, 2021 Registration Statement and February 8, 2021 Prospectus***

207.    On February 4, 2021, in connection with the February 2021 Secondary Offering, the Company filed a registration statement on Form S-1 with the SEC (the "February 2021 Registration Statement") which became effective on February 4, 2021. Four days later, on February 8, 2021, the Company filed a prospectus on Form 424B4

with the SEC (the "February 2021 Prospectus") (collectively, with the February 2021 Registration Statement, the "February 2021 Offering Documents"). Defendants Wu, Wheeler, Bain, Herman, Jaffe, Keffer, Kilar, and Solomon signed the February 2021 Offering Documents. The February 2021 Offering Documents again represented that Opendoor's pricing algorithm was the driver of Opendoor's profitability and that it was able to react to real-time economic conditions, stating the following, in relevant part:

> Pricing Accuracy. Our unique data works in concert with our pricing algorithms. These algorithms use machine learning to drive pricing decisions through demand forecasting, outlier detection, risk pricing, and inventory management. Over time, we have improved the pricing accuracy of our models as we add new data inputs and refine model logic, improvements that compound with experience and scale. As we have continued to demonstrate improving accuracy, we have also been able to increase our number of fully automated home valuations.

> Advancements in model sophistication have accelerated our feedback loops, such that our systems can dynamically adjust to leading market indicators and react to real-time macro- and microeconomic conditions. Our pricing algorithms are designed to dynamically adjust to leading indicators and market conditions so that the business can react to real-time economic conditions. This responsiveness is critical to pricing accurately and maintaining margins, especially in periods of volatility.

208.    The February 2021 Offering Documents further stated the following about Opendoor's algorithm and its importance to Opendoor's ability to generate profits:

> Pricing accuracy and automation. We have invested significant engineering, data science, and operations resources in our pricing infrastructure. Our proprietary, machine learning-based pricing models are key to our ability to acquire and resell thousands of homes per month accurately, profitably, and with increasing levels of automation. Based on our historical results, we believe pricing performance will continue to improve with operating experience and scale.

209.    The February 2021 Offering Documents also stated the following about

Opendoor's overall business model and the importance of "necessary repairs" to properties:

> In order to finalize our offer, we conduct a free assessment to confirm all of the home details and identify any repairs that may need to be performed. We have developed purpose-built software to guide home assessment workflows and collect over 100 unique data points regarding a home's condition and quality, which we incorporate as structured data into our underlying pricing models. Once completed, we finalize our offer, taking into consideration any necessary repairs, and produce the purchase agreement for the seller. Our objective is to provide a competitive cash offer to sellers and we believe this approach builds trust with our potential customers. Our business model is designed to generate margins from our service charge to sellers and ancillary products and services associated with a transaction, and not from the spread between acquisition price and resale price.

***March 4, 2021 Form 10-K***

210.    On March 4, 2021, the Company filed its annual report for the 2020 Fiscal Year on Form 10-K with the SEC (the "2020 10-K"). The 2020 10-K was signed by Defendants Wu, Wheeler, Bain, Herman, Keffer, Solomon, Kilar, and Jaffe and contained certifications, signed by Defendants Wu and Wheeler, pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of the financial statements contained in the 2020 10-K, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

211.    The 2020 10-K stated the following regarding Opendoor's AI algorithm's capabilities to respond to variable housing market conditions:

> Pricing accuracy. Our unique data works in concert with our pricing algorithms. These algorithms use machine learning to drive pricing decisions through demand forecasting, outlier detection, risk pricing, and

inventory management. Over time, we have improved the pricing accuracy of our models as we add new data inputs and refine model logic, improvements that compound with experience and scale. As we have continued to demonstrate improving accuracy, we have also been able to increase our number of fully automated home valuations.

Advancements in model sophistication have accelerated our feedback loops, such that our systems can dynamically adjust to leading market indicators and react to real-time macro- and micro-economic conditions. Our pricing algorithms are designed to dynamically adjust to leading indicators and market conditions so that the business can react to real-time economic conditions. This responsiveness is critical to pricing accurately and maintaining margins, especially in periods of volatility.

212.    The 2020 10-K also discussed the importance of the Company's proprietary technology to the Company's ability to generate revenue:

In order to finalize our offer, we conduct a free assessment to confirm all of the home details and identify any repairs that may need to be performed. We have developed purpose-built software to guide home assessment workflows and collect over 100 unique data points regarding a home's condition and quality, which we incorporate as structured data into our underlying pricing models. Once completed, we finalize our offer, taking into consideration any necessary repairs, and produce the purchase agreement for the seller. Our objective is to provide a competitive cash offer to sellers and we believe this approach builds trust with our potential customers. Our business model is designed to generate margins from our service charge to sellers and adjacent products and services associated with a transaction, and not from the spread between acquisition price and resale price.

***April 30, 2021 Proxy Statement***

213.    On April 30, 2021, the Company filed its Schedule 14A (the "2021 Proxy Statement") with the SEC. Defendants Wu, Bain, Herman, Jaffe, Keffer, Kilar, and Solomon solicited the 2021 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

214.    The 2021 Proxy Statement called for Company shareholders, *inter alia*, to:

87

1
2
3
4

(1) elect Defendants Herman, Jaffe, and Solomon to the Board; (2) ratify Deloitte & Touche LLP as the Company's independent auditor for the 2021 Fiscal Year; and (3) hold an advisory vote on executive compensation.

5
6

215.    Regarding the Company's Code of Conduct, the 2021 Proxy Statement stated, in relevant part:

7
8
9
10
11

> The Board has adopted a written code of business conduct and ethics (the "Code of Conduct"), which applies to all of our employees, officers and directors. Our Code of Conduct is available in the "Corporate Governance" section of our website at investor.opendoor.com. In addition, we intend to post on our website all disclosures that are required by law or the Nasdaq listing rules concerning any amendments to, or waivers from, any provision of our Code of Conduct.

12
13
14

216.    Regarding the Board's "Role in Risk Oversight," the 2021 Proxy Statement provided, in relevant part:

15
16
17
18
19
20

> The Board recognizes that the achievement of our strategic and commercial objectives involves taking risks and that those risks may evolve over time. The Board has oversight responsibility for Opendoor's risk management function, which is designed to identify, assess and monitor fundamental financial and business risks across the Company's operations and consider ways to address and mitigate those risks. Consistent with this approach, one of the Board's primary responsibilities includes reviewing assessments of, and advising management with respect to, significant risks and issues facing the Company, including risks related to the ongoing COVID-19 pandemic.

21
22
23
24
25
26
27
28

217.    Defendants Wu, Bain, Herman, Jaffe, Keffer, Kilar, and Solomon caused the 2021 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) Legacy Opendoor did not have a fully automated AI-powered algorithm; (2) as a result, Legacy Opendoor relied on human judgment to assess pricing trends and was, therefore, not as reliable or as high-quality of an operation as Defendants represented; (3) due to the foregoing, the post-Merger Company was susceptible to changing market

conditions just like its main competitor, Zillow; (4) the Company engaged in the Overpayment Misconduct; (5) Legacy Opendoor (and following the Merger, the Company) engaged in fraudulent business practices including charging customers for fake repairs to bolster profits; (6) Opendoor's contribution margins were susceptible to falling into the negatives; and (7) in light of the foregoing, Opendoor's financial projections were impossible to attain and patently unrealistic. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

218.    The 2021 Proxy Statement was also false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as the Individual Defendants violated the Code of Conduct, including by allowing false and misleading statements to be issued to the investing public. The 2021 Proxy Statement was also false and misleading because, despite assertions to the contrary, the Individual Defendants disregarded their role in risk oversight.

219.    As a result of Defendants Wu, Bain, Herman, Jaffe, Keffer, Kilar, and Solomon causing the 2021 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) reelect Defendants Herman, Jaffe, and Solomon to the Board, allowing them to continue to make false and misleading statements; (2) approve named executive officer compensation on an advisory, non-binding basis; and (3) ratify Deloitte & Touche LLP as the Company's independent registered public accounting firm for the 2021 Fiscal Year.

*November 10, 2021 Press Release*

220.    On November 10, 2021, the Company issued a press release that announced Opendoor's third quarter of 2021 financial performance. The press release stated, among other things, that Opendoor's contribution margin for the third quarter of 2021 was 7.5%, which was significantly lower than the Company's second quarter of 2021 contribution margin of 10.8%.

**November 10, 2021 Earnings Call**

221.    On November 10, 2021, Opendoor held an earnings call with investors and analysts to discuss the Company's third quarter of 2021 financial performance. The earnings call was held just one week after Zillow announced that it would cease its iBuying business, Zillow Offers, because the company's home pricing algorithm could not accurately predict housing prices. During the call, an analyst from Citi, Nicholas Jones, asked Defendant Wheeler, "One, can you touch on housing pricing volatility and how you feel your model is kind of positioned to withstand that, and kind of detected given some of the turnover. And then if let's say, prices you could press a little bit, how much contribution margin compression can we expect and how much can the kind of model withstand given some of the other kind of headlines and outline over the last two weeks? Thanks." Defendant Wheeler responded:

> Hey, Nick. Embedding your question is how do we price for homes and how do we think about forecasting. A couple of comments; one, we're very good at this. This is core to what we do. We have built over the last seven years, very robust pricing systems. We have seven years of investment in the data, in the modeling and in our team that allows us continuously improve how we model and approach home price valuations. We operate our business with a tight discipline.
>
> As Eric said, **we are rigorously back testing our models every day. They're**

90

***highly responsive. They have fast feedback loops and we can react to changing market conditions. Our forecasting accuracy was what allows us to manage the business within a reasonable range of outcomes and deliver margins within that 4% to 6% contribution margin range that we've guided to.*** Ultimately, the proof of our ability to do that is in our results. I just want to mention again, Q4 will mark our 20th consecutive quarter of positive [contribution margin].

So that's housing and – so the housing and forecasting question in total. And the part two of your question was around contribution margins, and how they may fluctuate with changes in HPA. ***Important is that our model really works in upmarkets, it's going to work in flat markets, it's going to work in downmarkets. We've*** talked about this before. But we are a market maker. Like define that, that means we provided putting in the customers, we're pricing a certainty and we're taking a spread. We're getting paid for that. And we're managing that our business to that 46% range I just indicated if HPA were to go down, we would look to fluctuate increase our spreads to manage to that target margin range. So, I would not marry HPA trend and contribution margin trends together. We're driving for consistency within that range of outcomes.

(Emphasis added.)

222.    Defendant Wheeler also spoke about Zillow's plight and assured investors of Opendoor's accurate pricing algorithm, stating the following, in relevant part:

One additional note on unit margins given the news of the last few weeks. We understand the importance of one, forecasting and two, managing seasonal and macro market changes. We have prioritized our investments and our pricing capabilities across acquisition valuation, forecasting and resell systems since our inception. These investments pair with a strong risk management DNA that's embedded in our pricing or operations, and our finance teams.

Our philosophy for growth has always been and will continue to be anchored in disciplined unit economics. I'd note that Q4 of 2021 will mark our 20th consecutive quarter of positive contribution margins.

**The Truth Begins to Emerge While False and Misleading Statements Continue**

*February 24, 2022 Form 10-K*

223.    On February 24, 2022, the truth began to emerge when the Company filed its annual report for the 2021 Fiscal Year on Form 10-K with the SEC (the "2021 10-K"). The 2021 10-K was signed by Defendants Wu, Wheeler, Bain, Herman, Keffer, Solomon, Kilar, and Jaffe and contained SOX certifications, signed by Defendants Wu and Wheeler, attesting to the accuracy of the financial statements contained in the 2021 10-K, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

224.    The 2021 10-K stated that Opendoor's contribution margin for the fourth quarter of 2021 was 4%, constituting a massive drop from the 12.6% contribution margin from the fourth quarter of 2020. The 2021 10-K also stated that "[o]ur ability to price homes competitively is fundamental to our business model."

225.    On this news, Opendoor's stock price fell $2.54, or 23.13%, from a closing price of $10.98 on February 24, 2022 to a closing price of $8.44 on February 25, 2022. A February 25, 2022 article by *The Real Deal* stated that "[t]he selloff was widely attributed to a drop in Opendoor's contribution margin, a key profitability metric that factors in the costs of carrying and selling home inventory."

*March 4, 2022 Wedbush Real Estate Technology Conference*

226.    On March 4, 2022, Defendant Wheeler represented Opendoor at the Wedbush Real Estate Technology Conference. During the conference, Defendant Wheeler fielded questions regarding Opendoor's AI algorithm and the Company's contribution

margins. The conference's moderator, Ygal Arounian, asked Defendnant Wheeler the following question:

> So going from 4Q to 1Q that the guide implies better our margins in 1Q. So, what's the bridge to get from where we were – see improvements in 1Q? And then, how do we think about the sustainability of your margins moving forward, when you've given the guideposts of that kind of 4% to 6% contribution margin, but maybe it's something that often comes up as how to think about that in a flat or declining HPA environment angle. Saw a couple quarters of flat HPA, it seems like it's sticking back up here again a little bit, but what about in a declining environment as well?

Defendant Wheeler responded by stating the following:

> So, our Q1 guide as you mentioned, it does imply a sequential increase in contribution margins to around 5%, and as we indicated on the call and we are at a point where walking into Q1 in a real position of strength, very healthy inventories we indicated on our call. We right size our operational capacity and we're seeing strong demand for homes. So we feel good about our setup for Q1.
>
> More broadly, you're [sic] bigger question about how do you manage margins over time relative to different HPA environments. ***Our business model is really designed to ensure that we can meet our annual margin target at 4% to 6% contribution margin, regardless of the home price environment we're operating in, and the way we do that is just how we price our homes.*** We are earning a return for providing liquidity and delivering a superior experience with certainty, and that return of the spread we need to earn is incorporated into every offer price that spray gets dynamically adjusted for every single home and it reflects the level of certainty we have for each home offer, certainly for us can it be impacted by factors like, what's the macro? What is the home price environment we're selling into? What's the rate of resale? As well as, a myriad of specific home conditions, age of digital home, death of (inaudible), a number of things.
>
> If the level of certainty we have is lower, we are going to be more conservative on our offer price, and obviously the inverse can hold too. If we have a high degree of confidence in the offer price, we can be at the higher end of the range, when we submit an offer to the customer. ***But it's really, this ability to dynamically price homes in response to both micro and macro factors that allows us to manage first of all, within that 4% to***

*6%, annual margin range, and regardless of the home cycle we're operating in that's really important part of our business model.*

(Emphasis added.)

227.    Moderator Ygal Arounian then asked Defendant Wheeler a follow-up question, stating "maybe you could just help share with investors a little bit more about the pricing algorithm, the model, why you've been successful there." Defendant Wheeler responded by stating:

> I can confirm for you that [] for us pricing is absolutely core to what we do. It is something that Opendoor's has been investing in religiously from day one as a core capability in eight years of investment and that's not going to abate. . . [W]e're like working on how do we accelerate our feedback loops all the time, because . . . being good at pricing is being dynamic about it, like we always want to be able to react every day to changes in macro and micro condition, and that responsiveness is critical to having quality pricing and certainly how do we manage our margins especially in periods of volatility.

**March 8, 2022 Morgan Stanley Technology, Media and Telecom Conference**

228.    On March 8, 2022, Defendant Wu attended the Morgan Stanley Technology, Media and Telecom Conference on behalf of Opendoor. During the conference, Defendant Wu fielded questions regarding Opendoor's ability to maintain its contribution margins during turbulent macroeconomic conditions in the housing market. One of the analysts asked Defendant Wu the following question:

> One of the other common discussions is around just the macro housing market. Housing market has been somewhat white hot for the last, let's call it, 12 months. Talk to us about how you think about philosophically, investing for growth as the housing market slows in the next couple of years as well as keeping safeguards in place to minimize balance sheet risk and have the- right checks and balances in place.

Defendant Wu responded by stating the following:

Yes. It's [not] . . . something that falls straight off. And so I would say a couple of things about risk. Obviously, this is something we study very closely and something we're very good at. There's four key points I want to make. One is that our homes are liquid listed assets, which is very different than a homebuilder or a REIT. And we hold homes for about 100 days, of which 50 days of that is under resale contract. That means we have a buyer, a deposit and a contract in place, right. So 50 days of that is on a resale contract. The other half is what you might call a listing exposure, right. And the second thing is that if you study the worst U.S. housing recession in history, which is the GFC or subprime crisis, the market moved much slower than people perceive. And so nationwide in the worst part of the recession, the prices moved a negative 2.8%. And obviously, our exposure is 50 days, but that's well within our margin of error vis-a-vis our contribution margin of 4% to 6%. ***And so if you run the business model through the worst recession in U.S. history, we would still have positive contribution margin.*** The third piece of that – that's assuming we don't know that there's a recession. So the third piece of that we've invested heavily in the data collection here. So we're tracking in real-time demand signals, both of our homes, visits, as well as market homes, clearance rates and what's happening in market, mortgage applications, all of the demand signals, then the form of pricing. So there's never a disconnect between what we view with supply side pricing and demand side. And so we're tracking the data very closely, and we're updating prices in real time. And then the fourth is really the debt structure. We have $11 billion of borrowing capacity, committed nonrecourse. If there's a dislocation, this gives us a tremendous amount of dry powder to actually capitalize on a dislocation.

(Emphasis added.)

229.    Later during the conference, an analyst, concerned whether Opendoor could keep positive contribution margins in a turbulent market, asked Defendant Wu the following question:

Thanks. Eric, [] relative to a lot of stocks in the market, the stocks underperformed a lot despite really positive revisions to revenue. You guys have been beating your numbers on revenue and gross margins. And what I hear most often a skepticism about the model itself. And I wanted to just kind of throw three [bear] cases [at] you in here, to get your response. The first is that . . . home price appreciation is the reason or kind of the necessary condition for you to have the types of gross margins that you did and that is

home price appreciation plateaued in the back half [of 2021]. We saw that with lower contribution margin in the fourth quarter [of 2021]. That's one. The second is that the business, it's a good business at small scale, but it just can't scale to the volumes that you guys have talked about over time. So Zillow started to grow big and they kind of got out of control and they're like, yes, let's get out of this. The other guys that are doing, iBuying are doing it at much smaller size. So the question is, can you guys do, can you scale the 50,000 homes or 75,000 homes or 100,000. Is that possible? And the third is that the adjusted gross profit that you report and adjusted EBITDA that you report isn't a really good representation of the economic value that you're creating and that, in particular, there's financing costs, you have cost of debt and mezzanine financing. And so whatever adjusted gross margin you're showing us or contribution margin, that's not really durable economic value. And I guess the question there is, do you have the ability to finance it and kind of generate working capital to create sustainable economics? Those are three.

Defendant Wu responded to the analyst's question by stating the following, in relevant part:

Yes, yes, what I would say is that the whole pricing function is to price the home with as much precision as possible given the risk in the system. And so we've already demonstrated that we can operate in a flat market. The company didn't benefit from 7% quarter-on-quarter appreciation when we started the company. And so I would say that I would point at the results over the past seven years in a less hot market. The other bear case literally two years ago was that we can operate in a hot market. And so now that we've demonstrated that we can actually make more margin in a hot market, there's more demand for the product, then there are many bear cases, can you operate in a declining HPA market. We have empirical evidence that, obviously, not all zip codes, not all cities, not all states have all gone up at the same velocity. So we have good evidence that we can operate in declining market. And outside of like inducing a recession, I can't give you more confidence outside of that. What I can say is that, again, if you apply the business to the subprime crisis and do the analysis, the business actually is quite healthy. And then the bull case is that demand flock to the site.

230.    Also during the conference, an analyst asked Defendant Wu, "How do you think about the difference in your model versus any of the competitors? And how do you continue to drive the differentiation for sellers and buyers?" Defendant Wu responded by

96

boasting about Opendoor's "automated" algorithm, stating the following:

> We have expertise in pricing, both off-line data collection and piping that
> into our models. We've built the lowest cost platform. We're 18 times more
> efficient at transacting than a realtor. And that's because we centralized,
> we've automated almost every step we possibly could and really invested
> heavily behind the scenes in that platform.

**April 8, 2022 Proxy Statement**

231.    On April 8, 2022, the Company filed its Schedule 14A (the "2022 Proxy
Statement") with the SEC. Defendants Wu, Bain, Herman, Jaffe, Keffer, Kilar, and
Solomon, solicited the 2022 Proxy Statement filed pursuant to Section 14(a) of the
Exchange Act, which contained material misstatements and omissions.

232.    The 2022 Proxy Statement called for Company shareholders, *inter alia*, to:
(1) elect Defendants Bain and Keffer to the Board; (2) ratify Deloitte & Touche LLP as
the Company's independent auditor for 2022 Fiscal Year; and (3) hold an advisory vote
on executive compensation.

233.    Regarding the Company's Code of Conduct, the 2022 Proxy Statement
stated, in relevant part:

> The Board has adopted a written code of business conduct and ethics (the
> "Code of Conduct"), which applies to all of our employees, officers and
> directors. Our Code of Conduct is available in the "Corporate Governance"
> section of our website at investor.opendoor.com. In addition, we intend to
> post on our website all disclosures that are required by law or the Nasdaq
> listing rules concerning any amendments to, or waivers from, any provision
> of our Code of Conduct.

234.    Regarding the Board's "Role in Risk Oversight," the 2022 Proxy Statement
provided, in relevant part:

> The Board recognizes that the achievement of our strategic and commercial

objectives involves taking risks and that those risks may evolve over time. The Board has oversight responsibility for Opendoor's risk management function, which is designed to identify, assess and monitor fundamental financial and business risks across the Company's operations and consider ways to address and mitigate those risks. Consistent with this approach, one of the Board's primary responsibilities includes reviewing assessments of, and advising management with respect to, significant risks and issues facing the Company.

235.    Defendants Wu, Bain, Herman, Jaffe, Keffer, Kilar, and Solomon caused the 2022 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) Legacy Opendoor did not have a fully automated AI-powered algorithm; (2) as a result, Legacy Opendoor relied on human judgment to assess pricing trends and was, therefore, not as reliable or as high-quality of an operation as Defendants represented; (3) due to the foregoing, the post-Merger Company was susceptible to changing market conditions just like its main competitor, Zillow; (4) the Company engaged in the Overpayment Misconduct; (5) Legacy Opendoor (and following the Merger, the Company) engaged in fraudulent business practices including charging customers for fake repairs to bolster profits; (6) Opendoor's contribution margins were susceptible to falling into the negatives; and (7) in light of the foregoing, Opendoor's financial projections were impossible to attain and patently unrealistic. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

236.    The 2022 Proxy Statement was also false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as the Individual Defendants violated the Code of Conduct, including by allowing false and

misleading statements to be issued to the investing public. The 2022 Proxy Statement was also false and misleading because, despite assertions to the contrary, the Individual Defendants disregarded their role in risk oversight.

237.    As a result of Defendants Wu, Bain, Herman, Jaffe, Keffer, Kilar, and Solomon causing the 2022 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1) reelect Defendants Bain and Keffer to the Board, allowing them to continue to make false and misleading statements; (2) approve named executive officer compensation on an advisory, non-binding basis; and (3) ratify Deloitte & Touche LLP as the Company's independent registered public accounting firm for the 2022 Fiscal Year.

### August 1, 2022 Press Release

238.    On August 1, 2022, Opendoor issued a press release that refuted the FTC's announcement of a settlement in their investigation into the Company that was released earlier that same day. The press release stated that Opendoor "strongly disagree[s]" with the FTC's conclusions, and claimed that the misconduct occurred between 2017 to 2019, stating the following:

> While we strongly disagree with the FTC's allegations, our decision to settle with the Commission will allow us to resolve the matter and focus on helping consumers buy, sell and move with simplicity, certainty and speed.
>
> Importantly, the allegations raised by the FTC are related to activity that occurred between 2017 and 2019 and target marketing messages the company modified years ago. We are pleased to put this matter behind us and look forward to continuing to provide consumers with a modern real estate experience.

239.    With these false and misleading statements, the Individual Defendants led

investors to believe that the misconduct alleged by the FTC was confined to 2017 through 2019. The very next day, on August 2, 2022, Opendoor's stock rose 1.25%, from a closing price of $4.79 per share on August 1, 2022 to close at a price of $24.85 per share on August 2, 2022. However, this was far from the truth, as Opendoor continued the misconduct throughout the Relevant Period.

### *August 4, 2022 Earnings Call*

240.    On August 4, 2022, Opendoor held an earnings call to discuss the Company's second quarter of 2022 financial performance with analysts and investors. During the call, Defendant Wheeler told investors that Opendoor's AI algorithm could adequately handle the turbulent housing market, stating that, "our systems are doing exactly what they're designed to do, which is responding very, very quickly, adjusting prices to market within recent spreads and new acquisitions."

241.    The Individual Defendants made and/or caused the Company to make to the investing public a series of materially false and misleading statements regarding the business, operations, and prospects of the Company and/or Legacy Opendoor. Specifically, the statements in ¶¶ 203-212, 220-222, 226-230, 238, and 240 improperly failed to disclose, *inter alia*, that: (1) Legacy Opendoor did not have a fully automated AI-powered algorithm; (2) as a result, Legacy Opendoor relied on human judgment to assess pricing trends and was, therefore, not as reliable or as high-quality of an operation as Defendants represented; (3) due to the foregoing, the post-Merger Company was susceptible to changing market conditions just like its main competitor, Zillow; (4) the Company engaged in the Overpayment Misconduct; (5) Legacy Opendoor (and following

the Merger, the Company) engaged in fraudulent business practices including charging customers for fake repairs to bolster profits; (6) Opendoor's contribution margins were susceptible to falling into the negatives; and (7) in light of the foregoing, Opendoor's financial projections were impossible to attain and patently unrealistic. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Fully Emerges**

242.    On September 19, 2022, Bloomberg published an article revealing that Opendoor lost money on forty-two percent of its transactions in August 2022, as measured by the prices the Company bought and sold homes. The Bloomberg article stated the following:

> [Opendoor], which sells thousands of homes in a typical month, lost money on 42% of its transactions in August, according to research from YipitData. Opendoor's performance — as measured by the prices at which it bought and sold properties — was even worse in key markets such as Los Angeles, where the company lost money on 55% of sales, and Phoenix, where the share was 76%.
>
> The losses, which don't include fees charged to customers or expenses incurred in renovating and marketing homes, have been looming since the housing market turned suddenly in recent months.
>
> * * *
>
> The company's rocky summer is reminiscent of the pricing problems that doomed Zillow Group Inc.'s iBuying business last year, according to a research note from Mike DelPrete, a scholar-in-residence at the University of Colorado Boulder. That doesn't mean Opendoor is going to shut down the business, but it demonstrates the depth of the losses — and September is likely to be even worse than August, DelPrete's analysis shows.
> Opendoor's metrics are in the danger zone," DelPrete said in an interview. "They are very close to where Zillow was in its worst moments."

The iBuying model relies on acquiring homes, making light repairs and reselling the properties — often within a few months of the initial purchase. When home prices were skyrocketing earlier in the year, Opendoor banked easy profits. Then dwindling affordability and mortgage rates soaring toward 6% this spring finally pushed would-be buyers to the sidelines.

By June, median home prices had begun to decline in some areas, especially the Sun Belt markets that had been frothiest in the pandemic boom days. The shift caught Opendoor by surprise, leaving it to offload thousands of properties it had agreed to purchase when prices were rising.

* * *

The shares slid 4.7% to $3.87 at 3:28 p.m. New York time Monday. They were down 72% this year through the close on Sept. 16.

243.    On this news, the Company's share price dropped $0.32, from a closing price of $3.88 per share on September 19, 2022 to close at a price of $3.56 per share on September 20, 2022. The Company's share price continued to fall the next trading day, dropping another $0.31, from a closing price of $3.56 per share on September 20, 2022 to close at a price of $3.25 per share on September 21, 2022.

### *October 1, 2022* **The Motley Fool** *Article*

244.    On October 1, 2022, *The Motley Fool* published an article that stated, "given the recent Bloomberg coverage, investors should ask whether Opendoor will suffer a fate similar to (or worse than) Zillow's iBuying business or if there is hope for long-term success." The article further stated that "[r]apidly decreasing home prices mean Opendoor is likely struggling to sell homes fast enough to offset the decline in value between the time they buy a house and resell it. ***Investors will find out more when the company reports third-quarter earnings***." (Emphasis added.)

### *November 3, 2022 Form 10-Q and November 23, 2022* **Seeking Alpha** *Article*

245.    The truth fully emerged on November 3, 2022 when Opendoor filed a Form

10-Q with the SEC for the third quarter ended September 30, 2022 (the "3Q22 10-Q"). The 3Q22 10-Q revealed that the Company's contribution margin had slid into the negatives for the third quarter of 2022, bottoming out at -0.7%, which was significantly below the 4% to 6% contribution margin Opendoor represented to investors it would have, and even further below Opendoor's 7.5% contribution margin from the third quarter of 2021.

246.    On this news, the Company's share price dropped $0.32, from a close of $2.34 per share on November 3, 2022 to a close of $2.02 per share on November 4, 2022. The Company's share price continued to fall the next trading day, dropping $0.29 from a close of $2.02 per share on November 4, 2022, to a close of $1.74 per share on November 7, 2022.

247.    On November 23, 2022, *Seeking Alpha* published an article titled, "Opendoor Must Adapt Its Business Model To Improve Flexibility – Or Continue Value Freefall." The article reported that the Company's AI algorithm was not capable of quickly responding to evolving macroeconomic changes in the housing market and suggested that issues with the algorithm were more serious than just processing changes in interest rates. In relevant part, the article stated the following:

> Of the 3 iBuying platforms that remain in operation, Opendoor recorded the largest losses, despite owning the largest market share. Profit margins tell a similar story, as all three of the remaining iBuyers struggle to achieve profitability even before accounting for any expenses besides COGS.

> ***

> While these declines may be largely attributed to elevated inflation levels and spikes in interest rates (discussed further in next section), the fact that

these macroeconomic changes can wreak such havoc on the profitability of this business model illustrates the inflexibility of these businesses to respond to changing circumstances and reveals concerning underlying problems that perhaps go deeper than interest rates. Additionally, while Redfin has other aspects of their business which provide a more diverse revenue stream, Opendoor and Offerpad do not have other sources of revenue that can help sustain the business in times of trouble.

## DAMAGES TO OPENDOOR

248.    As a direct and proximate result of the Individual Defendants' conduct, Opendoor will lose and expend many millions of dollars.

249.    Such losses include overpayment made by the Company in consideration of the Merger.

250.    Such losses include compensation paid to Defendants pursuant to the Incentive Plan.

251.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

252.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

253.    Such expenditures also include, but are not limited to, the Company's $62 million settlement with the FTC, and amounts paid to outside lawyers, accountants, and

investigators in connection thereto, and losses of revenues caused by customers' loss of trust in the Company's business and products.

254.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

255.    As a direct and proximate result of the Individual Defendants' conduct, Opendoor has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

256.    Plaintiff brings this action derivatively and for the benefit of Opendoor to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' violations of Section 14(a) of the Exchange Act.

257.    Opendoor is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

258.    Plaintiff is, and at all relevant times has been, an Opendoor shareholder. Plaintiff will adequately and fairly represent the interests of Opendoor in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

259.    Plaintiff incorporates by reference and re-alleges each and every allegation

105

stated above as if fully set forth herein.

260.    A pre-suit demand on the Board of Opendoor is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following nine Individuals: Defendants Wu, Wheeler, Keffer, Solomon, Kilar, Jaffe, Herman, Bain, and Rice (the "Director-Defendants"). Plaintiff needs only to allege demand futility as to five of the nine Directors who are on the Board at the time this action is commenced.

261.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to cause the Company to engage in the Overpayment Misconduct and to make and/or cause the Company to make false and misleading statements and omissions of material fact, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

262.    Demand is also excused as to the Director-Defendants because pursuant to the Merger Proxy Statement, shareholders were asked to approve their future compensation through approving the Incentive Plan, which reserved shares of the Company's common stock to be used in the future for, among other things, the benefit of the Director-Defendants. These financial incentives have precluded the Director-Defendants from acting in the best interests of the shareholders, as they have failed to correct the false and misleading statements and omissions contained in the Merger Proxy Statement, the solicitation of which they materially benefitted from since it resulted in their election as Company directors and shareholder approval of the Incentive Plan.

263.    To date, Defendants Keffer, Bain, Jaffe, Kilar, Herman, Solomon, and Rice have received material personal benefits under the Incentive Plan as a result of the Director-Defendants' solicitation of the false and misleading Merger Proxy Statement which called for shareholder approval of the Incentive Plan. Shareholders would not have approved the Incentive Plan had they known the true state of affairs at the Company or at Legacy Opendoor. As a result of shareholder approval of the Incentive Plan, Defendants Keffer, Bain, Jaffe, Kilar, Herman, Rice, and Solomon each received $206,622 worth of stock awards during the 2021 Fiscal Year and $163,986 worth of stock awards during 2022 Fiscal Year from the Company pursuant to the Incentive Plan; they will receive stock awards while they remain as directors. As a result, Defendants Keffer, Bain, Jaffe, Kilar, Herman, Rice, and Solomon are beholden to the SCH Defendants (who solicited the Merger Proxy Statement), and the SCH Defendants (currently sitting on the Board) are beholden to each other, and, thus, cannot be presumed to be disinterested in taking action to redress the misconduct alleged herein. As such, demand upon Defendants Keffer, Bain, Jaffe, Kilar, Herman, Rice, and Solomon is futile and, therefore, excused.

264.    Additional reasons that demand on Defendant Wu is futile follow. Defendant Wu co-founded Legacy Opendoor in 2014. He served as Legacy Opendoor's CEO and as a member of its board from Legacy Opendoor's founding until the Merger. He then served as Opendoor's CEO and Chairman of the Board from the Merger until December 1, 2022.  He now serves as the Company's President of Marketplace and as a director. As the Company's CEO throughout the Relevant Period, Defendant Wu was ultimately responsible for all of the false and misleading statements and omissions that

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

were made by or on behalf of the Company during the Relevant Period, including those which he signed in the Registration Statement, the Merger Proxy Statement, and the Second Registration Statement. He also solicited the 2021 Proxy Statement and 2022 Proxy Statement, both of which contained false and misleading statements and contributed to the re-election of Defendants Herman, Jaffe, Solomon, Bain, and Keffer, which allowed them to continue making false and misleading statements. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Wu with his principal occupation for which he receives handsome compensation including over $370 million during the 2020 Fiscal Year following the Merger. As the Company's former highest officer and co-founder, Defendant Wu conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Wu is a defendant in the Securities Class Action. Additionally, Defendant Wu engaged in a wealth of insider trading throughout the Relevant Period, selling over 5.3 million shares for immense personal proceeds totaling approximately $112 million. For these reasons, Defendant Wu faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him his futile and, therefore, excused.

265.    Additional reasons that demand on Defendant Wheeler is futile follow. Defendant Wheeler has served as Opendoor's CEO since December 2022 and as a Company director since September 2020. From September 2020 until December 2022, she served as the Company's CFO. Prior to this, Defendant Wheeler served as a director

of Legacy Opendoor from October 2019 until the Merger. Defendant Wheeler has received and continues to receive significant compensation for her role as a director as described above, including over $50 million during the 2020 Fiscal Year following the Merger. As a trusted Company director and as the Company's highest officer, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. She also solicited the 2021 Proxy Statement and 2022 Proxy Statement, both of which contained false and misleading statements and contributed to the re-election of Defendants Herman, Jaffe, Solomon, Bain, and Keffer, which allowed them to continue making false and misleading statements. Moreover, Defendant Wheeler is a defendant in the Securities Class Action. For these reasons, Defendant Wheeler faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

266.   Additional reasons that demand on Defendant Bain is futile follow. Defendant Bain has served as a Company director since the Merger. He also serves as a member of the Audit Committee and the Compensation Committee. Prior to this, Defendant Bain served as an SCH director from October 2019 until the Merger. Defendant Bain has received and continues to receive compensation for his role as a director as described above, including $282,896 for the 2021 Fiscal Year. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such

controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He also solicited the Merger Proxy Statement, the 2021 Proxy Statement, and 2022 Proxy Statement, all of which contained false and misleading statements and contributed to the election and re-elections of Defendants Herman, Jaffe, Solomon, Keffer, and Defendant Bain himself to the Company's Board, which allowed them to continue making false and misleading statements. For these reasons, Defendant Bain faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

267.    Additional reasons that demand on Defendant Herman is futile follow. Defendant Herman has served as a Company director since the Merger. She also serves as the Chair of the Audit Committee. Prior to this, Defendant Herman served as an SCH director from October 2019 until the Merger. Defendant Herman has received and continues to receive compensation for her role as a director as described above, including $636,877 for the 2020 and 2021 Fiscal Years. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. She also solicited the Merger Proxy Statement, the 2021 Proxy Statement, and 2022 Proxy Statement, all of which contained false and misleading statements and contributed to the election and re-elections of Defendants Bain, Jaffe, Solomon, Keffer, and Defendant Herman herself to the Company's Board, which allowed them to continue making false and misleading statements. For these reasons, Defendant

Herman faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

268.    Additional reasons that demand on Defendant Jaffe is futile follow. Defendant Jaffe has served as a Company director since the Merger. He also serves as a member of the Nominating and Corporate Governance Committee. Prior to this, Defendant Jaffe served as a Legacy Opendoor director from June 2018 until the Merger. Defendant Jaffe has received and continues to receive compensation for his role as a director as described above, including $263,726 for the 2021 Fiscal Year. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He also solicited the Merger Proxy Statement, the 2021 Proxy Statement, and 2022 Proxy Statement, all of which contained false and misleading statements and contributed to the election and re-elections of Defendants Bain, Herman, Solomon, Keffer, and Defendant Jaffe himself to the Company's Board, which allowed them to continue making false and misleading statements. For these reasons, Defendant Jaffe faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

269.    Additional reasons that demand on Defendant Keffer is futile follow. Defendant Keffer has served as a Company director since the Merger. He also serves as a member of the Audit Committee. Prior to this, Defendant Keffer served as a Legacy

Opendoor director from October 2015 until the Merger. Defendant Keffer has received and continues to receive compensation for his role as a director as described above, including $274,421 for the 2021 Fiscal Year. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He also solicited the Merger Proxy Statement, the 2021 Proxy Statement, and 2022 Proxy Statement, all of which contained false and misleading statements and contributed to the election and re-elections of Defendants Bain, Herman, Solomon, Jaffe, and Defendant Keffer himself to the Company's Board, which allowed them to continue making false and misleading statements. For these reasons, Defendant Keffer faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

270.    Additional reasons that demand on Defendant Kilar is futile follow. Defendant Kilar has served as a Company director since the Merger. He also serves as the chair of the Nominating and Corporate Governance Committee. Prior to this, Defendant Kilar served as a Legacy Opendoor director from March 2019 until the Merger. Defendant Kilar has received and continues to receive compensation for his role as a director as described above, including $274,421 for the 2021 Fiscal Year. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his

duties to protect corporate assets. He also solicited the Merger Proxy Statement, the 2021 Proxy Statement, and 2022 Proxy Statement, all of which contained false and misleading statements and contributed to the election and re-elections of Defendants Bain, Herman, Solomon, Jaffe, Keffer, and Defendant Kilar himself to the Company's Board, which allowed them to continue making false and misleading statements. For these reasons, Defendant Kilar faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

271.    Additional reasons that demand on Defendant Solomon is futile follow. Defendant Solomon has served as a Company director since the Merger. He also serves as the Chair of the Compensation Committee. Prior to this, Defendant Solomon served as a Legacy Opendoor director from February 2015 until the Merger. Defendant Solomon has received and continues to receive compensation for his role as a director as described above, including $280,077 for the 2021 Fiscal Year. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He also solicited the Merger Proxy Statement, the 2021 Proxy Statement, and 2022 Proxy Statement, all of which contained false and misleading statements and contributed to the election and re-elections of Defendants Bain, Herman, Solomon, Jaffe, Keffer, Kilar and Defendant Solomon himself to the Company's Board, which allowed them to continue to make false and misleading statements. For these reasons, Defendant

Solomon faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

272.    Additional reasons that demand on Defendant Rice is futile follow. Defendant Rice has served as a Company director since the Merger. He also serves as the Company's Lead Independent Director and as a member of the Nominating and Corporate Governance Committee. Prior to this, Defendant Rice served as a Legacy Opendoor director until the Merger, as the Company notes on its website. Defendant Rice has received and continues to receive compensation for his role as a director as described above, including $627,711 for the 2021 Fiscal Year. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. He also solicited the 2021 Proxy Statement and 2022 Proxy Statement, both of which contained false and misleading statements and contributed to the election and re-elections of Defendants Bain, Herman, Solomon, Jaffe, Keffer, Kilar and Solomon to the Company's Board, which allowed them to continue to make false and misleading statements. For these reasons, Defendant Rice faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

273.    Additional reasons that demand on the Board is futile follow.

274.    Demand would also be futile as a result of various of the Director-Defendants receiving additional material personal benefits as a result of the SCH

114

Defendants' solicitation of the false and misleading Merger Proxy Statement. For instance, Defendant Wu's compensation rose over 1300x as a result the Merger, rising from total compensation amounts of $275,000 in 2019 from Legacy Opendoor, to total compensation amounts of more than $370 million in 2022 from Opendoor. Likewise, Defendant Wheeler received more than $50.2 million in 2020 from the Company following the closing of the Merger. Moreover, all of the Defendants who served on Opendoor's Board after the Merger, including Defendants Wu, Wheeler, Bain, Herman, Jaffe, Keffer, Kilar, and Solomon, received large grants of Opendoor restricted stock in the weeks following the Merger as a result of the SCH Defendants' solicitation of the false and misleading Merger Proxy Statement, making it unlikely that these Director-Defendants would take action against the SCH Defendants. For these reasons, too, demand on these Director-Defendants would be futile.

275.    Moreover, Defendants Herman, Keffer, and Bain served as members of the Audit Committee during the Relevant Period. In violation of the Audit Committee Charter, Defendants Herman, Keffer, and Bain failed to adequately exercise their risk management and risk assessment functions and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Conduct. Thus, Defendants Herman, Keffer, and Bain are not disinterested, and demand is excused as to them.

276.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to cause the Company to issue materially false and misleading statements to the

public, and to facilitate and disguise the Individual Defendants' violations of law, including violations of the Exchange Act. In violation of the Code of Conduct, the Director-Defendants failed to avoid conflicts of interest or the appearance of conflicts of interest; maintain the accuracy of Company records; comply with all applicable laws, rules, and regulations; and properly report violations of the Code of Conduct and applicable laws, rules, and regulations. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

277.    Opendoor has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Opendoor any part of the damages Opendoor suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

278.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

279.    The acts complained of herein constitute violations of the Exchange Act by Opendoor's officers and directors, and these acts are incapable of ratification.

280.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Opendoor. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Opendoor, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

281.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Opendoor to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

282.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Director-Defendants, cannot consider a demand

1  with disinterestedness and independence. Consequently, a demand upon the Board is

2  excused as futile.

### CLAIM

**Against the Individual Defendants for Violations of Section 14(a) of the Securities Exchange Act of 1934**

283.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

284.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

285.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

286.    Under the direction and watch of the Individual Defendants, the Merger Proxy Statement, the 2021 Proxy Statement, and the 2022 Proxy Statement failed to disclose that: (1) Legacy Opendoor did not have a fully automated AI-powered algorithm;

(2) as a result, Legacy Opendoor relied on human judgment to assess pricing trends and was, therefore, not as reliable or as high-quality of an operation as Defendants represented; (3) due to the foregoing, the post-Merger Company was susceptible to changing market conditions just like its main competitor, Zillow; (4) the Company engaged in the Overpayment Misconduct; (5) Legacy Opendoor (and following the Merger, the Company) engaged in fraudulent business practices including issuing fake repairs to bolster profits; (6) Opendoor's contribution margins were susceptible to falling into the negatives; (7) in light of the foregoing, Opendoor's financial projections were impossible to attain and patently unrealistic; and (8) Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the Incentive Plan. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

287.    Moreover, the Merger Proxy Statement, the 2021 Proxy Statement, and the 2022 Proxy Statement failed to disclose that the Board's oversight and risk mechanisms were not adequate given the aforementioned misconduct and that the Code of Conduct was not complied with. The Merger Proxy Statement, the 2021 Proxy Statement, and the 2022 Proxy Statement also failed to disclose that SCH had failed to conduct proper due diligence of Legacy Opendoor's operations leading up to the Merger.

288.    The Individual Defendants knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Merger Proxy Statement, the 2021 Proxy Statement, and the 2022 Proxy Statement were materially false and misleading. The misrepresentations and omissions

were material to Plaintiff and Company shareholders in voting on the matters set forth for shareholder determination in the Merger Proxy Statement, the 2021 Proxy Statement, and the 2022 Proxy Statement.

289.    The misrepresentations and omissions in the Merger Proxy Statement were material to Plaintiff and Company shareholders in voting on the matters set forth for shareholder determination, including, *inter alia*: (1) approval of the Merger; (2) approval of the Organizational Documents Proposals; (3) election of Defendants Wu, Keffer, Solomon, Kilar, Jaffe, and Herman as directors to the post-Merger Company's Board; (4) approval of a proposal for the PIPE financing; (5) approval of a proposal to adopt the Incentive Plan; and (6) approval of the Employee Stock Plan.

290.    As a result of Plaintiff and shareholders voting to approve the Merger, the overpayment was made by the Company in consideration of the Merger.

291.    As a result of Plaintiff and shareholders voting to approve the Incentive Plan based on Defendants' false and misleading statements in the Merger Proxy Statement, to date, under the Incentive Plan, Defendants Keffer, Bain, Jaffe, Kilar, Herman, and Solomon have each received from the Company $206,622 worth of stock awards during the 2021 Fiscal Year and $163,986 worth of stock awards during 2022 Fiscal Year; they will continue to receive compensation pursuant to the Incentive Plan while they remain as directors.

292.    The misrepresentations and omissions in the 2021 Proxy Statement were material to Plaintiff and Company shareholders in voting on the matters set forth for shareholder determination therein, including but not limited to: (1) election of Defendants

Herman, Jaffe, and Solomon to the Board; (2) ratification of Deloitte & Touche LLP as the Company's independent auditor for the 2021 Fiscal Year; and (3) the holding of an advisory vote on executive compensation.

293.    The misrepresentations and omissions in the 2022 Proxy Statement were material to Plaintiff and Company shareholders in voting on the matters set forth for shareholder determination therein, including but not limited to: (1) election of Defendants Bain and Keffer to the Board; (2) ratification Deloitte & Touche LLP as the Company's independent auditor for 2022 Fiscal Year; and (3) holding an advisory vote on executive compensation.

294.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Merger Proxy Statement, 2021 Proxy Statement, and 2022 Proxy Statement.

295.    Plaintiff, on behalf of Opendoor, has no adequate remedy at law.

### **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Opendoor, and that Plaintiff is an adequate representative of the Company;

(b)    Determining and awarding to Opendoor the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(c)    Directing Opendoor and the Individual Defendants to take all necessary

actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Opendoor and its shareholders from a repeat of the damaging events described herein. The following actions may be necessary to ensure proper corporate governance policies:

     1.    a proposal to strengthen the board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

     2.    a provision to permit the shareholders of Opendoor to nominate at least five candidates for election to the board; and

     3.    a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)    Awarding Opendoor restitution from Individual Defendants, and each of them;

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: October 18, 2023

**MCKAY LAW, LLC**


By:  */s/ Michael McKay*
Michael McKay (023354)
5635 N. Scottsdale Road, Suite 170
Scottsdale, AZ 85250
Telephone: (480) 681-7000
Email: mmckay@mckaylaw.us

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, New York 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

**BRONSTEIN, GEWIRTZ &
GROSSMAN, LLC**
Peretz Bronstein
Eitan Kimelman
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com
eitank@bgandg.com

*Counsel for Plaintiff*

## <u>VERIFICATION</u>

I, Samhita Gera, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 15__ day of October, 2023.

DocuSigned by:

CF385B635442498...

Samhita Gera